J-A11004-18

2018 PA Super 269

| IN THE INTEREST OF: J.N.W. , A MINOR | IN THE SUPERIOR COURT OF PENNSYLVANIA |
|---|---|
| APPEAL OF:  COMMONWEALTH OF PENNSYLVANIA | |
| | No. 1759 MDA 2017 |

Appeal from the Order Entered October 10, 2017
In the Court of Common Pleas of Berks County
Juvenile Division at No: CP-06-JV-0000457-2016

BEFORE:  STABILE, J., NICHOLS, J., and PLATT, J.*

OPINION BY STABILE, J.:                                   **FILED OCTOBER 03, 2018**

The Commonwealth appeals from the October 10, 2017 order entered in the Court of Common Pleas of Berks County, Juvenile Division, granting the motion to suppress filed by Appellee, J.N.W., in relation to charges of endangering welfare of children ("EWOC") and drug delivery resulting in death ("DDRD").[1]  The Commonwealth argues that J.N.W. was not subjected to custodial interrogations at the time she provided statements to police and a

_____

* Retired Senior Judge assigned to the Superior Court.

[1] 18 Pa.C.S.A. §§ 4304(a)(1) and 2506(a), respectively.

deputy coroner, obviating the need for **Miranda**[2] warnings. After careful review, we affirm.

At issue in this case are four statements given by J.N.W. in the days following events that occurred on May 18 and 19, 2016. In its December 22, 2017 opinion, the suppression court issued its findings of fact, several of which reflected stipulations of the parties. Opinion, 12/22/17, at 1-6, ¶¶ 1-48. Our review confirms that the court's factual findings are supported by the record with one clarification, as will be explained below. Although the underlying facts will be explored in more detail herein, we initially provide the following factual background based on our review of the suppression hearing transcripts and the DVD interview of J.N.W. conducted on May 23, 2016.

J.N.W. was nine days short of her eighteenth birthday on May 19, 2016, when her best friend, eighteen-year-old Nicholas Lintz ("Lintz"), died of a heroin overdose. In the hours before his death, Lintz and J.N.W. had snorted the heroin in the apartment where J.N.W. lived with her mother ("Janis") and with J.N.W.'s three-year-old son ("E.W."). Janis was in North Carolina at the time. E.W. was in the apartment with J.N.W. and Lintz.[3]

At 4:41 a.m. on May 19, J.N.W. called 911 because Lintz was not breathing. Three officers from the Exeter Police Department responded to the

---

[2] **Miranda v. Arizona**, 384 U.S. 436 (1966).

[3] E.W.'s father dropped the child off at J.N.W.'s apartment after J.N.W. purchased the heroin but before she and Lintz snorted it.

call.  One of the officers, Officer Karen Grycon, comforted J.N.W. at a distance of approximately ten to fifteen feet from where the other officers and paramedics worked on Lintz, who was on the floor in the apartment's bathroom when they arrived.  J.N.W. initially denied drug use but then admitted that she and Lintz had snorted heroin she obtained through a friend and that Lintz had also consumed alcohol.  She stated she flushed the packaging and what was left of the heroin down the toilet.  She did not disclose the identity of the friend who supplied the heroin.  Officer Grycon explained to J.N.W. that she would have to go to the hospital to be evaluated because she was a juvenile who had ingested heroin.  Officer Grycon told J.N.W. to call E.W.'s father to come stay with the child while J.N.W. went to the hospital.  J.N.W. was taken to Reading Hospital by EMS.  *See* Notes of Testimony ("N.T."), 7/22/17, at 6-14, 40.

Lintz was transported to Reading Hospital where he was pronounced dead at 5:47 a.m.  A deputy coroner received a call from the hospital about a possible overdose death.  He conducted an examination, took photographs and drew materials for toxicology testing.  He called the Exeter Police Department and was told no one from the department would be going to the hospital.  At approximately 8:00 a.m., a nurse asked the coroner if he wished to speak with Lintz's "girlfriend."  He went to J.N.W.'s room, identified himself, and told her wanted to find out what had happened before Lintz was taken to the hospital.  She admitted to heroin use but declined to identify the source.

The coroner reported on his conversation to the police and indicated he would write up a report that included J.N.W.'s statements.

J.N.W.'s grandfather picked her up from the hospital. J.N.W. then went to school. When three officers arrived at the school, J.N.W. was meeting with a counselor. The principal allowed the officers to interview J.N.W. in the principal's office where they met for 15 to 20 minutes behind closed doors. The officers obtained information about how she and Lintz obtained the heroin, although J.N.W. did not disclose the name of the source. The officers also retrieved her cell phone, as authorized by Janis in a telephone conversation.

The police subsequently obtained a search warrant for J.N.W.'s apartment and seized cell phones, iPads, laptops, and drug paraphernalia. In one of several telephone conversations between Janis and Exeter Police Detective Godshall, Janis agreed she would bring J.N.W. to the police station upon her return to Pennsylvania.

On May 23, Janis and J.N.W. went to the Exeter Police Department where they met with Detectives Godshall and Gresh for a taped interview that last approximately one hour and twenty minutes. During that interview, J.N.W. recounted in detail the events of the evening of May 18 and early morning hours of May 19. She discussed calling her "connect" and meeting with her to purchase four bags of heroin for $45, but did not identify the "connect" because she did not want to "rat" on her. She related the warning

from the "connect" that the heroin was strong and that someone had overdosed on half a bag.

On June 14, 2017, J.N.W. filed a motion to suppress statements. The suppression court held hearings on June 22 and July 18, 2017. At the conclusion of proceedings on July 18, the suppression court set a schedule for the filing of memoranda. On October 10, 2017, the suppression court issued its order granting the motion to suppress. The Commonwealth filed a timely appeal. Both the Commonwealth and the suppression court complied with Pa.R.A.P 1925.

In this appeal, the Commonwealth presents one issue for our consideration:

A. Did the suppression court err by concluding that J.N.W. was subjected to custodial interrogations where she was neither in custody nor asked questions likely to elicit incriminating responses?

Commonwealth Brief at 4.

In **Commonwealth v. Korn**, 139 A.3d 249 (Pa. Super. 2016), this Court explained:

> Our standard of review in addressing a challenge to the suppression court's granting of a suppression motion is well settled.
>
> > When the Commonwealth appeals from a suppression order, we follow a clearly defined standard of review and consider only the evidence from the defendant's witnesses together with the evidence of the prosecution that, when read in the context of the entire record, remains uncontradicted. The suppression court's findings of fact bind an appellate court if the record supports those findings. The suppression

> court's conclusions of law, however, are not binding on an appellate court, whose duty is to determine if the suppression court properly applied the law to the facts.
>
> ***Commonwealth v. Miller***, 56 A.3d 1276, 1278–1279 (Pa. Super. 2012) (citations omitted). "Our standard of review is restricted to establishing whether the record supports the suppression court's factual findings; however, we maintain *de novo* review over the suppression court's legal conclusions." ***Commonwealth v. Brown***, 606 Pa. 198, 996 A.2d 473, 476 (2010) (citation omitted).

***Id.*** at 252-53.

In the instant case, the evidence presented by the defense included the stipulations of the parties[4] and the testimony of J.N.W.'s mother, Janis. In her testimony, Janis explained that she had several conversations with Detective Godshall as she was making her way back to Pennsylvania from North Carolina. One conversation related to J.N.W.'s phone, which she authorized Detective Godshall to retrieve. "[H]e mentioned he was going to send someone over to the school to get the phone." N.T., 7/18/17, at 46. She understood one officer would go and she did not give her consent for police to take J.N.W.'s statement at school. "All the conversations I had with Detective Godshall, we were waiting until I got back and I'd come to the police station." ***Id.*** at 47. While it was her recollection that she took J.N.W. to the police station as soon as she arrived back in Pennsylvania, the record confirms

---

[4] The stipulations of the parties were admitted as Defense Exhibit 1 on the first day of the suppression hearing.

the interview at the police station took place four days later, on May 23, 2016. *Id.* at 50-51.

The Commonwealth presented testimony of two police officers, two detectives, and the deputy coroner. In addition, the DVD of J.N.W.'s May 23 interview was admitted at the hearing as Commonwealth Exhibit 1. For purposes of our review, we consider only the stipulations of the parties and Janis' testimony, together with the evidence of the prosecution that, when read in the context of the entire record, remains uncontradicted. *Korn*, 139 A.3d at 252. Again, this Court is bound by the suppression court's findings of fact, to the extent they are supported in the record. *Id.*

The suppression court's opinion includes 48 specific findings of fact. Of those, 26 are based upon stipulations between the parties. We do not question any of those 26. The remaining 22 include citations to the record from the two days of hearings and from the DVD interview conducted at the Exeter Police Department on May 23, 2016. While we do not find that any of the 22 include misstatements of fact, we do believe that Finding of Fact 44 requires clarification.

FINDING OF FACT 44

According to Finding of Fact 44, "When [J.N.W.] asked if she could get in trouble for what she said, the police replied no. DVD."[5] This finding of fact warrants amplification.

Detective Godshall informed J.N.W. that the "Good Samaritan law"[6] would preclude any charges against her for using drugs because she called 911 to report Lintz's overdose and stayed with him until EMS personnel arrived. However, the detective also informed her she would *not* be immune from other forms of prosecution. On several occasions, both detectives mentioned that they would not do anything that would get her "in trouble" (using the suppression court's word), but they could not speak for the District Attorney who might not be thrilled if she did not cooperate in identifying her "connect." The detectives also noted she might be putting her baby at risk of going to foster care if she did not cooperate. Therefore, while the detectives told J.N.W. that she would not get "in trouble" with them, they did not tell her she would not be in trouble with the District Attorney. Finding of Fact 44 is accepted with that clarification.

In sum, we are bound by the suppression court's findings of fact to the extent they are supported by the record. We conclude the findings are

---

[5] The suppression court referred to the DVD as the source of the exchange between J.N.W. and the police.

[6] References to the "Good Samaritan law" refer to the Drug Overdose Response Immunity statute, 35 P.S. § 780-113.7, which provides immunity from prosecution for possessory offenses under certain circumstances.

supported by the record, as clarified above. We now turn to our *de novo* review of the suppression court's legal conclusions.

In **Commonwealth v. Freeman**, 128 A.3d 1231 (Pa. Super. 2015), this Court explained:

> It is a fundamental precept of constitutional law that a suspect subject to a custodial interrogation by police must be warned that he has the right to remain silent, that anything he says may be used against him in court, and that he is entitled to the presence of an attorney. **Miranda**, 384 U.S. at 469, 86 S.Ct. 1602. If an individual is not advised of those rights prior to a custodial interrogation, any evidence obtained through the interrogation is inadmissible at trial. **In re K.Q.M.**, 873 A.2d 752, 755 (Pa. Super. 2005). The **Miranda** safeguards are triggered "whenever a person in custody is subjected to either express questioning or its functional equivalent." **Rhode Island v. Innis**, 446 U.S. 291, 292, 100 S.Ct. 1682, 64 L.Ed.2d 297 (1980). Instantly, we focus our discussion upon whether Freeman was "in custody" for **Miranda** purposes at the time of his statement, because there is no doubt that [the detective's] questioning constituted an interrogation. **Innis**, 446 U.S. at 292, 100 S.Ct. 1682 (defining interrogation to include express questioning and its functional equivalent).
>
> We have explained that an individual is in custody for **Miranda** purposes when he "is physically denied ... his freedom of action in any significant way or is placed in a situation in which he reasonably believes that his freedom of action or movement is restricted by the interrogation." **K.Q.M.**, 873 A.2d. at 755 (citing **Commonwealth v. Williams**, 539 Pa. 61, 650 A.2d 420, 427 (1994)). "[T]he police officer's subjective intent does not govern the [custody] determination," instead we look to "the reasonable belief of the individual being interrogated." **Commonwealth v. Zogby**, 455 Pa. Super. 621, 689 A.2d 280, 282 (1997). In order to ascertain the defendant's reasonable belief, the reviewing court must consider the totality of circumstances, including factors such as "the basis for the detention; the duration; the location; whether the suspect was transferred against his will, how far, and why; whether restraints were used; the show, threat, or use of force; and the methods of investigation used to confirm or dispel

suspicions." ***Commonwealth v. Busch***, 713 A.2d 97, 101 (Pa. Super. 1998).

*Id.* at 1240-41. Further:

"[I]f a suspect makes a statement during custodial interrogation, the burden is on the Government to show, as a prerequisite to the statement's admissibility in the Government's case in chief, that the defendant voluntarily, knowingly and intelligently waived his rights." ***J.D.B. v. North Carolina,*** [564 U.S. 261, 269-70] (2011) (internal quotations omitted).

> The inquiry has two distinct dimensions. First the relinquishment of the right must have been voluntary in the sense that it was the product of a free and deliberate choice rather than intimidation, coercion or deception. Second, the waiver must have been made with a full awareness both of the nature of the right being abandoned and the consequences of the decision to abandon it. Only if the totality of the circumstances surrounding the interrogation reveal both an uncoerced choice and the requisite level of comprehension may a court properly conclude that ***Miranda*** rights have been waived.

> A determination of whether a juvenile knowingly waived his ***Miranda*** rights and made a voluntary confession is to be based on a consideration of the totality of the circumstances, including a consideration of the juvenile's age, experience, comprehension and the presence or absence of an interested adult.

*In re T.B.,* 11 A.3d 500, 505–506 (Pa. Super. 2010) (quotations, citations, and emphasis omitted).

***In re B.T.***, 82 A.3d 431, 436 (Pa. Super. 2013).[7] However,

"[W]e acknowledge that the *per se* requirement of the presence of an interested adult during a police interview of a juvenile is no

---

[7] The parties stipulated that J.N.W. had no prior experience with law enforcement. Stipulation #46. They also stipulated that J.N.W. was in the high school as of May 2016 "but has since graduated and at the time had a full academic scholarship to Albright College." Stipulation #47.

longer required. Nevertheless, it remains one factor in determining the voluntariness of a juvenile's waiver of his *Miranda* rights." *In the Interest of T.B.*, 11 A.3d [500, 507 (Pa. Super. 2010)] (citing *Commonwealth v. Williams*, 504 Pa. 511, 475 A.2d 1283 (1984)).

*Commonwealth v. Knox*, 50 A.3d 732, 746-47 (Pa. Super. 2012).

The suppression court examined each of the four encounters between J.N.W. and authorities and concluded J.N.W. was subjected to custodial interrogations and did not knowingly waive her *Miranda* rights. We consider each of the encounters separately as well.

QUESTIONING OF J.N.W. IN HER HOME

The suppression court determined J.N.W. was subjected to a custodial interrogation on the night of the incident and that her statements cannot represent a voluntary waiver of her *Miranda* rights. The court determined Officer Grycon "actively restricted" J.N.W.'s movements and refused to allow J.N.W. to leave her home "even when [she] expressed her desire to do so." Opinion, 12/22/17, at 7. Further, the court noted her psychological state, which it concluded would have inhibited her ability to make a rational waiver of her rights, and also commented that no adult was present in the home. *Id.* Therefore, the court determined the statements made that night were to be suppressed.

Officers Grycon and Loder testified about their interaction with J.N.W. on the night in question. Officer Grycon explained J.N.W. was "crying and upset and very agitated and upset." N.T., 6/22/17, at 6. Officer Grycon

testified she tried to comfort J.N.W. and keep her away from Lintz so the other officers and paramedics could work on him. *Id.* at 6-7. Officer Grycon testified that J.N.W. admitted heroin and alcohol consumption, after first denying that Lintz had consumed anything. However, once she admitted to heroin use, she would not disclose the source of the heroin. *Id.* at 7-8. Counsel for J.N.W. stipulated that neither Officer Grycon nor any other officer on the scene handcuffed or otherwise restrained J.N.W. While neither officer informed J.N.W. that she was not free to leave, she was advised she would have to be checked out at the hospital because she was a juvenile and had possibly consumed bad drugs. *Id.* at 9-10. Officer Grycon advised J.N.W. to contact E.W.'s father to come to the apartment and stay with the child while J.N.W. was at the hospital. *Id.* at 10. Officer Grycon acknowledged her "concern was this 3-year-old little boy in bed and . . . [t]hey are doing drugs when he's there. I wanted to make sure he was okay. . . . And I said, so you are here doing drugs and with this 3-year-old? That was my concern with the 3-year-old." *Id.* at 16.

While the presence of an interested adult is no longer a *per se* requirement during a police interview of a juvenile, it remains a factor in determining whether the juvenile voluntarily waived *Miranda* rights. *Knox*, 50 A.3d at 746-47. Considering the totality of the circumstances surrounding the interview of a visibly upset J.N.W. on the night of Lintz's death, including questioning about the source of the drugs and snorting drugs while a three-

year old child was in the apartment, and the directive to call the child's father to come to the apartment because, as a juvenile, she had to go to the hospital to be checked out, we find no error of law in the suppression court's conclusion that J.N.W. was subjected to a custodial interrogation and that she did not knowingly waive her *Miranda* rights.

QUESTIONING OF J.N.W. AT THE HOSPITAL

J.N.W. was taken by EMS to Reading Hospital to be evaluated. While there, the deputy coroner—a former police officer with approximately 26 years' experience on the force—was present at the hospital in response to a report of Lintz's overdose death. After conducting tests, the coroner was asked if he would like to speak with Lintz's "girlfriend" before she went home. After contacting the Exeter Police Department and being advised no one from the department would be going to the hospital, the coroner went to her room, identified himself as being from the coroner's office, and told her he "was just trying to find out what events occurred that led to the death." N.T., 6/22/17, at 32.

J.N.W. told the coroner that she and Lintz each got two bags of heroin and they did the heroin before having sex. The coroner "wanted to ask a little more detail on that. I asked who she got the heroin from and how they came to get it." *Id.* at 35. She told him that she used her cell phone to call the person to get heroin but did not reveal the identity of the person she called. *Id.* at 35-36. J.N.W. told the coroner she was 17. *Id.* at 37. She also told

him that E.M.S. personnel took her to the hospital but she did not want to go. *Id.* at 40.

Of note is a stipulation between the parties that "[w]hile at the hospital [J.N.W.] expressed that she wanted to leave but a nurse and then a doctor told her that she couldn't leave." Stipulation #11. Further, although the deputy coroner testified that he identified himself as such, J.N.W. was under the misimpression that he was a police detective, as reflected on the DVD memorializing her fourth interview.

We agree with J.N.W. that this case is similar to *In re C.O.*, 84 A.3d 726 (Pa. Super. 2014), where this Court determined that a caseworker was required to provide *Miranda* warnings to a resident she was investigating in a juvenile detention center. Although the caseworker was not a police officer, she was investigating the juvenile and her questions elicited incriminating responses forming the basis of prosecution. *Id.* at 736. As this Court recognized in *Commonwealth v. Heggins*, 809 A.2d 908 (Pa. Super. 2002), "Under certain circumstances, individuals who are not law enforcement personnel nevertheless possess the status of law enforcement for purposes of custodial interrogation." *Id.* at 914 (citing *Commonwealth v. Chacko*, 459 A.2d 311, 313-14 (Pa. 1983) (director at a state correctional institution assumed investigatory duties when questioning defendant about his involvement in a crime)). Similarly, a custodial interrogation occurred when a Children and Youth Services' ("CYS") caseworker secured a confession from

a defendant in a child molestation case because "CYS is not only a treatment agency, but is the investigating arm of the statewide system of Child Protective Services." *Commonwealth v. Ramos*, 532 A.2d 465, 468 (Pa. Super. 1987)). *Cf. Heggins*, 809 A.2d at 916 (counselors at treatment were not equivalent of law enforcement for *Miranda* purposes because they were providing treatment, not conducting an investigation, and defendant was aware his statement would be reported to law enforcement)

This Court has recognized that a coroner in Pennsylvania has powers that make the coroner part of the Commonwealth's criminal investigation team. *Commonwealth v. Anderson*, 385 A.2d 365, 371-72 (Pa. Super. 1978) (*en banc*). For instance, a coroner is charged with investigating facts and circumstances of deaths occurring under suspicious circumstances, including those in which drugs may have had a direct bearing on the outcome. 16 P.S. § 1237(a)(2). "The purpose of the investigation shall be to determine the cause of any such death and to determine whether or not there is sufficient reason for the coroner to believe that any such death may have resulted from criminal acts or criminal neglect of persons other than the deceased." 16 P.S. § 1237(b). Further, "[i]n the exercise of [the coroner's duties], the coroner shall, so far as may be practicable, consult and advise with the district attorney." 16 P.S. § 1242.

As J.N.W. notes, rather than inform J.N.W. about Lintz's death and question her about the cause of death, he instead asked questions about the

person who provided the heroin, a line of questioning not designed to lead to a determination of death. Appellee's Brief at 20. The nature of his questions, coupled with the fact J.N.W. did not want to remain at the hospital and was reluctant to answer questions, and the fact the coroner reported on his interview of J.N.W. to law enforcement, supports the conclusion J.N.W. was subjected to a custodial interrogation while at the hospital.

Considering the totality of the circumstances, we agree with the suppression court that J.N.W. was in custody for **Miranda** purposes at the hospital. Therefore, we find no error in the court's determination that statements J.N.W. made in the hospital must be suppressed.

QUESTIONING OF J.N.W. AT SCHOOL

Three officers, including Detective Gresh, arrived at J.N.W.'s school to retrieve her cellphone. Prior to that encounter, Janis authorized sending an officer to retrieve J.N.W.'s phone. As Janis testified at the suppression hearing, she did not authorize an interview of her daughter at the time, understanding that an interview would be conducted when Janis returned to Pennsylvania.

When the officers arrived at the school, J.N.W. was meeting with a counselor. She was taken to the principal's office where the officers interviewed her behind a closed door for approximately 15 to 20 minutes. During the interview, the officers attempted to obtain information regarding the source of the heroin and explained they were trying to prevent additional

deaths. N.T., 7/18/17, at 5-6, 11, 13. Detective Gresh acknowledged that J.N.W. was "very apprehensive" in her responses to their requests for information regarding the source of the heroin. *Id.* at 11. She eventually identified the person as a female who was known to her but would not identify the female because she did not want to be a "rat." *Id.* at 11-13. During the course of the interview, J.N.W. was stoic and made little eye contact. *Id.* at 14-15.

Considering the totality of the circumstances, we find that J.N.W. did not waive her *Miranda* rights when she was interviewed behind closed doors by three officers mere hours after Lintz's death. Again, her mother, who was on the road on the way back from North Carolina, authorized police only to retrieve J.N.W.'s cell phone. She did not authorize officers to interview her daughter. We agree with the suppression court the interview at school constituted a custodial interrogation and that J.N.W. did not waive her *Miranda* rights. We find no error of law in the suppression court's conclusions.

QUESTIONING OF J.N.W. AT EXETER POLICE DEPARTMENT

J.N.W. and her mother Janis met with Detectives Godshall and Gresh for an interview at the police station four days after Lintz's death. J.N.W. did not want to go to the interview but Janis told her she "had to go." *Id.* at 48. Janis was present for the duration of the interview and did tell J.N.W., prior to

the officers entering the room, that she did not need a lawyer because she was being interviewed only as a witness.[8]

At the outset of the interview, the officers allowed J.N.W. to detail, without interruption, the events of May 18 and 19, and she did not appear reluctant to do so, although she clearly was not interested in disclosing the identity of her "connect." Nevertheless, the officers continued to question J.N.W. about the source of the heroin despite J.N.W.'s insistence that she did not want to be a "rat" or a "snitch." While the officers tried to assure her that the "connect" would not know who identified her, J.N.W. stated, "I would know." D.V.D., 5/23/17, at time stamp 18:42 (approximate).

While the interview likely did not rise to the level of a custodial interrogation initially, the officers made references to CYS and continued to press J.N.W. on the identity of her "connect" while mentioning that the District Attorney would be looking at EWOC charges.[9] On a number of occasions, Detective Godshall made remarks to the effect that the District Attorney would not be thrilled with her refusal to identify the source of the heroin. He also mentioned that the Good Samaritan Law would provide her immunity relating

---

[8] The basis for Janis' belief that J.N.W. was being interviewed "only as a witness" is not evident from the record.

[9] Stipulation #41 provides "The police told J.N.W. that delivery of drugs is illegal and this conversation will go to the District Attorney and to CYS, and that J.N.W. cold be charged with [EWOC] and that if J.N.W. did not reveal the name of the person who had brought the heroin that the District Attorney would see that as not cooperating."

to the use of drugs but would not make her immune from other forms of prosecution. He suggested they were not "making" J.N.W. help them. *Id.* at time stamp 18:50 (approximate). He later commented that if she identified the source, nothing would happen but if she did not, "bad stuff will happen." *Id.* at time stamp 19:13 (approximate). Toward the end of the interview, he told her that the goal was her welfare and the welfare of her child and that her future and the future of her child hinged on the choices she made when she walked out the door. *Id.* at time stamp 19:18-19:20 (approximate). He reminded her that kids of addicts are removed from their parents and placed in foster care. *Id.* at time stamp 19:23 (approximate). She commented that she felt she was being blackmailed. Stipulation #44.

The suppression court concluded that "[t]he officers' demeanor, her mother's own urging for her to answer the questions posed, her demonstrated reluctance to do so, and the very lengthy interview time all weigh toward [J.N.W.'s] statements not constituting a voluntary waiver." Opinion, 12/22/17, at 10. We agree. Considering the totality of the circumstances, including the several threatening references to possible charges against her and possible removal of her son from her care, we find no error in the suppression court's conclusion.

Based on our review, we conclude the suppression court properly applied the law to the facts of this case. Finding no error of the law in the

court's grant of J.N.W.'s suppression motion, we shall affirm the suppression court's order.

Order affirmed.

Judge Platt joins this opinion.

Judge Nichols concurs in the result.


Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary


Date: <u>10/03/2018</u>