J-S39013-19

2019 PA Super 330

| | | |
|---|---|---|
| IN THE INTEREST OF: N.M., A MINOR | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| | : | |
| | : | |
| | : | |
| | : | |
| APPEAL OF: N.M., A MINOR | : | No. 2819 EDA 2018 |

Appeal from the Order Dated September 14, 2018
In the Court of Common Pleas of Montgomery County
Juvenile Division at No(s):  CP-46-JV-0000517-2018

BEFORE:  GANTMAN, P.J.E., STABILE, J., and STEVENS*, P.J.E.

OPINION BY GANTMAN, P.J.E.:                    **FILED OCTOBER 31, 2019**

Appellant, N.M., appeals from the dispositional order entered in the Montgomery County Court of Common Pleas, following his adjudication of delinquency on five counts of theft by unlawful taking and three counts of burglary.[1]  We affirm.

The relevant facts and procedural history of this case are as follows.

> On May 13, 2018, the father of a family who lived in a home at 439 East Marshall Street in the Borough of Norristown contacted the Norristown Police Department to report that his home had been burglarized, and seven hundred dollars stolen, while he, his wife and their three children slept upstairs.  Approximately two weeks later, the father contacted Norristown Police Detective Klinger and gave him a video recording from a surveillance camera on the premises.  The video recording appeared to depict [Appellant], whom Detective Klinger knew well, in the act of criminal trespass on a residential property at 439 East Marshall Street in Norristown.
>
> On June 27, 2018, twenty-four days before [Appellant's] eighteenth birthday, Detective Klinger prepared to interview

---

[1] 18 Pa.C.S.A. §§ 3921(a) and 3502(a)(1)(ii), respectively.

---

*   Former Justice specially assigned to the Superior Court.

[Appellant] about the trespass and burglary at 439 East Marshall Street, but he also planned to ask [Appellant] about a burglary at 701 Arch Street in Norristown. Detective Klinger had known [Appellant] for five or six years by that time. When the detective was a patrolman, [Appellant] would walk the beat with him for hours at a time. Then-patrolman Klinger and his patrol partner grew to like [Appellant]. When they learned someone had stolen his bicycle, they gave him a new one. But as familiar as [Detective Klinger] was with [Appellant], when it came to investigating the two burglaries, Detective Klinger decided to enlist the help of a fellow officer who knew [Appellant] even better than he: Detective Stephen Sowell. As a former school resource officer assigned to [Appellant's] middle school, Detective Sowell had taken [Appellant] on field trips and to baseball games as part of a mentoring program. [Appellant] even testified that he used to talk to Detective Sowell about becoming a policeman someday. Detective Sowell testified he and other police officers had a good relationship with [Appellant]. "[Appellant] has always been around town even before we met him in the school," he elaborated. "He would follow us around on patrol calls; he would follow us on his bike. So…the whole department knew [Appellant]. He's not a bad kid. He just sometimes makes bad choices. Even then, whenever we have contact with [Appellant], we're always trying to help him out."

Detective Sowell testified that as of June 27, 2018[,] he had known [Appellant] and his mother for approximately seven years, and in that time he "had to speak to [Appellant] many times." He stated that [Appellant] had been arrested ten times in Norristown and had been a subject of twenty police reports in total. Nonetheless, when Detective Klinger told Detective Sowell he suspected [Appellant] of being involved in the burglary on Arch Street, Detective Sowell doubted [Appellant] would have committed a crime that serious. Detective Sowell explained, "I've known [Appellant] to do things, you know, little things here and there, but I've never known him to do something like that." [Detective Sowell] explained that there were "some items taken in that burglary that I personally didn't think fit [Appellant]. It was a large TV. I couldn't see him taking a TV. And alcohol was reported stolen, and I've never known him to abuse alcohol."

Detective Klinger asked Detective Sowell to serve as the main police contact with [Appellant] because [Detective Sowell] was specifically assigned to work with juveniles and had a better relationship with [Appellant] and his mother. Detective Sowell called [Appellant's] mother at approximately 9:00 a.m. on June 27th and told her he suspected her son of being involved in multiple burglaries. He asked, "is it okay if we talk with him and get a statement?" He asked if she would "send him down" to the police station and she replied that she would.

Detective Sowell also contacted a man named Maurice Allen, a caseworker who supervised [Appellant] in the Academy Aftercare program, which was providing court-ordered supervision as the result of a prior delinquency disposition. Detective Sowell testified that he "wanted to reach out to [Mr. Allen] and see if he knew where [Appellant] was, and if [Mr. Allen] could help bring [Appellant] in so we could talk with [Appellant]." Detective Sowell testified that he knew "that children supervised by the Academy are accountable" to their case workers, but even [Appellant] did not testify that Mr. Allen took [Appellant] into custody, drove him to the police station, or made threats or promises to induce him to submit to an interview. [Appellant] merely said, "Maurice called and said that I had to come down [to the police station], because they said there was like burglaries that had been robbed."

Detective Sowell expected to see [Appellant] around noon, but he arrived at the police station only minutes later, at approximately 9:30 a.m. [Appellant] did not appear to be under the influence of drugs or alcohol. When [Appellant] arrived, Detective Sowell brought [Appellant] back into the Detective Division, which is an open office area divided into cubicles. Several detectives were present, including Detective Klinger in addition to Detective Sowell, and both were wearing their badges and guns that day. [Appellant] testified that Detective Sowell had to open one door on the way back, and said the office had no windows or doors to the outside. Although entry to the office was restricted, exit was not. [Appellant] was free to leave, and was not restrained with handcuffs or shackles. [Appellant] testified that he did not "know if [he] could leave the way [he] had

come in[,]" but the [court] finds that testimony not to be credible, mainly because of [Appellant's] demeanor, but also because of his prior history of ten arrests by the Norristown police department, which employed Detective Sowell as its juvenile officer.

The detectives did not place [Appellant] under arrest because they were still trying to gather information about the two burglaries, one on Arch Street and the other on East Marshall. More specifically, [Appellant] was on juvenile probation and was wearing a "cuff," an electronic ankle bracelet by which his movements could be tracked by means of GPS,[2] and the detectives were in the process of obtaining the GPS data to determine whether [Appellant] was in the vicinity of the burglaries on Arch Street and East Marshall Street when they occurred.

Detective Sowell told [Appellant] that the police had received reports about burglaries of occupied homes, that [Appellant] had been captured on video at the scene of one of the burglaries, and that he was worried [Appellant] was growing up to be "the type of person that's going to do this…." According to [Appellant], Detective Klinger stopped over to Detective Sowell's desk to show [Appellant] a still photo taken from the video recording, showing [Appellant] at the home on East Marshall Street.

The tone of the conversation between Detective Sowell and [Appellant] was casual. Detective Sowell asked [Appellant] "what are you going to do," "what are you doing for work" and "what's going on with your family?" [Detective Sowell] encouraged [Appellant] to find a job with his older brother, who had just been admitted to college, and suggested that [Appellant] should learn a trade. Then [Detective Sowell] reminded [Appellant] that the police had tried to mediate many things with him before, but would "not be able to mediate this one." [Detective Sowell] told [Appellant] that he might be placed in a residential program for juvenile delinquents, but added, "That's probably a good thing if you can go into a placement somewhere where you can learn a trade and pick up something or get enough credits to

_____

[2] Global Positioning System.

graduate."

After Detective Sowell spoke with [Appellant] for approximately ten minutes Detective Klinger began questioning [Appellant] about the burglary on Arch Street. After being shown a photo of the house, [Appellant] said he wasn't sure whether he had burglarized it, but added that "maybe he was around back." Detective Sowell still "didn't think that house sounded like [Appellant]," and thought "he would have remembered taking a TV and alcohol." Detective Sowell even told [Appellant] he didn't think [Appellant] was responsible for that burglary. The detectives asked [Appellant] "if he wanted to take a ride," and they got into an unmarked car and drove past the [Arch Street] house. [Appellant] told them he did not burglarize "that house," meaning the one on Arch Street.

While in the car, the detectives continued to talk about what [Appellant] planned to do with his life, and the only questions they asked him about their investigation pertained to the burglary on Arch Street, not East Marshall. They drove toward the site of the East Marshall Street burglary, and as they neared it [Appellant] "pointed over to Marshall Street" and spontaneously blurted out, "I was in that one." The house he pointed to was the one at 439 East Marshall Street, which was the location where [Appellant] had been recorded on video. As they drove back to the police station by way of Moore Street, [Appellant] blurted out, "I was in this one and this one." Detective Klinger expressed surprise to Detective Sowell, because they had no burglary reports from those houses.[3] When asked about the unreported burglaries on cross-examination, Detective Sowell said, "If they were unreported and it was [Appellant], I personally would give him the benefit of the doubt." They returned to the station and told [Appellant] he was free to leave, but that they would contact him if they needed to speak to him again. They offered him a ride home, but he preferred to walk.

[3] In addition to being charged with the burglary at the home at East Marshall Street, [Appellant] was charged with the burglaries of a home at 335 East Moore Street and 312 East Airy Street. The Moore Street burglary had not been reported to the police department until

June [25, 2018,] and the Airy Street burglary had not been reported until June [23, 2018].

In the early afternoon Detective Sowell obtained the GPS location data from [Appellant's] cuff, which placed him within a block of three burglaries at the time each was committed. (None of the three was the burglary of the home on Arch Street.) With that information, Detectives Sowell and Klinger were prepared to question [Appellant] again. They drove to [Appellant's] home, where Detective Klinger spoke to his mother about having [Appellant] come to the police station again that afternoon. She was sitting on a couch, holding her baby. Notably, [Detective Klinger] did not testify that she said her baby was sick, nor did counsel for [Appellant] ask a question that would have elicited such testimony on cross-examination. She appeared to comprehend the conversation and did not appear to be under the influence of drugs or alcohol. When she told Detective Klinger that [Appellant] was not at home, he told her that he was probably going to give [Appellant] his **Miranda**[3] warnings and take a statement. He asked if she wanted to be present and she said, "No, he can handle that," or "No, he can handle himself." She asked no questions about how [Appellant] would be treated at the police station but said, "I don't know what I'm going to do about this one," expressing her worry about [Appellant] to Detective Sowell. The detectives then returned to the police station.

Shortly after they returned to the police station, [Appellant] arrived on his own. He did not appear to be under the influence of drugs or alcohol. Detective Sowell testified that [Appellant] arrived between three o'clock and three thirty in the afternoon. Detective Klinger testified [Appellant] arrived at approximately three o'clock. The evidence produced by the Commonwealth against [Appellant] includes a small discrepancy in this regard, because Detective Klinger wrote in the affidavit of probable cause, "At 1530 hours [Appellant] met with me at the police station…." This discrepancy is minor, and is easily ascribed to imperfect attention to detail. Alternatively, the text of

---

[3] **Miranda v. Arizona**, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966).

the affidavit does not necessarily exclude the possibility that [Appellant] arrived at the police station before 3:30, but did not meet with Detective Klinger until 3:30. Under the circumstances, further described *infra*, the [court] found Detective Klinger's testimony credible.

Before questioning [Appellant], Detective Klinger telephoned [Appellant's] mother, told her [Appellant] was with [Detective Klinger], told her he was going to take a statement from [Appellant], and asked her if she wanted to come to the police station to be present. She told him "no," and turned down an offer to speak with her son on the telephone. [Detective Klinger] told her he was going to read her son the ***Miranda*** warnings but she cut him off, telling him she knew what they were and that he had her permission to take a statement from [Appellant]. She asked if [Appellant] would be placed in a residential program, and Detective Klinger replied that he did not know, but that did not motivate her to go to the police station.

Detective Klinger asked [Appellant] if he wanted to speak with his mother, but he said, "no." Detective Klinger then read [Appellant] the ***Miranda*** rights from a written form, holding it so [Appellant] could read along. Detective Klinger's demeanor was calm and friendly. [Appellant] told Detective Klinger that he understood his rights. [Appellant] had no questions. In court, when testifying on his own behalf, [Appellant] conceded that he understood the form to state "my rights." [Appellant] agreed to be questioned, and did not ask to speak to his mother, a lawyer or another adult before giving a statement to Detective Klinger.

When the interview began, [Appellant] told Detective Klinger that he was not under the influence of medication, alcohol or a controlled substance, and that he was not suffering from a medical condition that would impair his ability to understand the questions and answer completely and truthfully. He was never handcuffed or shackled. While questioning [Appellant], Detective Klinger kept a normal conversational tone and demeanor, refraining from raising his voice or "pressing answers" from [Appellant]. Detective Klinger made no threats or promises to [Appellant]. Detective Sowell was asked on direct examination, "Did you hear Detective Klinger make any threats to [Appellant]

about signing the *Miranda* form?" His answer was immediate, forceful and credible: "No, that wouldn't have happened while I was in the office."

Detective Klinger told [Appellant] that he could refuse to answer any questions and stop the questioning any time he wished. [Appellant] never asked to stop the interview, but Detective Leeds, who was also present, ordered a pizza and beverage for [Appellant] and himself, and [Appellant] took a break from the interview to eat. At the end of the questioning, he was given an opportunity to review the [statement] and make changes or additions. His only response was to say, "I apologize for what I did. I was thinking dumb. I just wanted money."

[Appellant] testified on his own behalf at the hearing on the suppression motion, and his version of events differed materially from those of the three detectives. [Appellant] said that in the morning, while riding in the unmarked police car, the detectives took him to four houses and asked him questions about all four. [Appellant] also said that when he was questioned in the afternoon, Detective Sowell said he "had to" sign the waiver-of-rights form, or he would be charged with "the seven other burglaries." He said he asked to speak to a lawyer, but the detectives refused. [Appellant] said he wanted to stop answering questions, and the detectives told him, "No, you have to." In many other respects, though, [Appellant's] testimony was similar to that of the detectives, and corroborated theirs.

[Appellant's] mother also testified on his behalf. Her testimony also differed materially from that of the detectives. She testified that on the morning of June 27, 2018, when Detective Sowell first contacted her to ask her to send [Appellant] to the police station, he did not tell her she had a right to be with him at the police station. Nonetheless, she revealed that she was aware that she could have done so because she testified, "I told him that the baby was sick. I would be there, but the baby was sick." Regarding the afternoon questioning of her son, she testified that the detectives called to say they were detaining him, but never offered to let her speak with him. She testified that Detective Klinger did inform her of her son's *Miranda* rights when he came to her house, but not later, over the

telephone. When asked on cross-examination whether she did not want [Appellant] to be placed in a residential program as a result of the eventual disposition of the delinquency proceeding, she replied, "Right is right and wrong is wrong. I'm not saying no, I'm not saying yeah."

The differences in the testimony between the detectives, on the one hand, and [Appellant] and his mother, on the other hand, required the undersigned, as the trier of fact, to weigh the veracity of the narratives of the witnesses. Detectives Sowell, Klinger and Leeds were sequestered, so none of them knew how the others testified, yet the testimony of each corroborated that of the others. Even the testimony of [Appellant] and his mother corroborated key elements of their testimony. [Appellant] acknowledged that he was read his *Miranda* rights before being questioned in the afternoon; and his mother confirmed the timeline of the events and acknowledged that she understood she was allowed to be present with her son during the interview. The detectives' answers to questions, whether on direct examination or on cross, were responsive, not evasive or argumentative. They sometimes admitted they were uncertain as to some facts, and sometimes their testimony differed in small details, but those features indicated their testimony was not rehearsed, and thus inured to their credibility. None of the detectives spoke with a rote or robotic tone of voice.

In contrast, [Appellant's] demeanor was cagey and he appeared unresponsive. He was looking down, evading eye contact while he testified. His answers to the leading questions of his lawyer were robotic and rote, as if they had been rehearsed. [Appellant's] mother's demeanor suggested she was somewhat evasive and less than fully forthcoming, but she corroborated material elements of the testimony of the detectives, and she admitted to feeling ambivalent about the possibility that her son might be placed in a residential treatment program as a result of the eventual disposition.

With regard to specific differences in the testimony, the observation of the witnesses in the courtroom clearly indicated that the detectives were fully credible, but [Appellant] and his mother were less so. [Appellant]

testified that he wanted to stop the interview, but was told he had to continue. He testified that he asked for a lawyer, but was denied one. He testified that he was threatened with being charged with seven burglaries if he did not admit to three of them. The undersigned finds all of that testimony to be not credible. [Appellant's] mother had no objection to her son going to the police station to be questioned by the police officers in the morning or the afternoon. She was fully aware that she could come along, but she did not want to. She did not want to talk about how her son would be treated at the police station in the afternoon because she knew and trusted the detectives, particularly Detective Sowell. She had the opportunity to listen to Detective Klinger tell her the ***Miranda*** rights to which [Appellant] was entitled, but she did not want to listen. She was worried about the path [Appellant] was following as he reached the legal age of adulthood and she was ambivalent about whether placement in a residential treatment facility might be best for him if he was adjudicated delinquent.

(Trial Court Opinion, filed November 20, 2018, at 2-14) (internal citations omitted).

In his afternoon statement, Appellant admitted he had entered three different residences and removed items from each residence. On July 12, 2018, Appellant filed a motion to suppress all oral and written statements given to police on June 27, 2018. Appellant filed an amended motion to suppress on July 18, 2018. The court held a suppression hearing on August 6, 2018, and subsequently denied Appellant's motion to suppress. On August 27, 2018, following a stipulated hearing, the court adjudicated Appellant delinquent on five counts of theft and three counts of burglary. On September 14, 2018, the court ordered Appellant to be placed in a residential facility at Summit Academy, to complete 30 hours of community service, and to pay

$1,000.00 in restitution. Appellant timely filed a notice of appeal on September 25, 2018. On September 27, 2018, the court ordered Appellant to file a concise statement of errors complained of on appeal pursuant to Pa.R.A.P. 1925(b). Appellant complied.

Appellant raises the following issue for our review:

> DID THE JUVENILE COURT ERR IN DENYING [APPELLANT'S] MOTION TO SUPPRESS WRITTEN AND ORAL STATEMENTS WHERE [APPELLANT] WAS SUBJECTED TO CUSTODIAL INTERROGATION WITHOUT THE PROVISION OF *MIRANDA* WARNINGS AND WHERE SUCH WARNINGS WERE ONLY OFFERED AS A FORMALITY AT THE CONCLUSION OF THE POLICE INVESTIGATION, AT WHICH POINT [APPELLANT'S] ALLEGED WAIVER OF CONSTITUTIONAL RIGHTS WAS NOT VOLUNTARILY, KNOWINGLY AND INTELLIGENTLY GIVEN?

(Appellant's Brief at viii) (footnote omitted).

Appellant argues police subjected him to a custodial interrogation on the morning of June 27, 2018, because a court-appointed supervisor told Appellant to go to the police station, where police questioned him in a "secured" room and in a police car, which showed Appellant reasonably believed he was not free to leave. Appellant contends the questions during the morning constituted a custodial interrogation, because the police knew that the questions they asked were likely to elicit an incriminating response. Appellant submits the custodial interrogation without *Miranda* warnings warranted suppression of any oral or written statement Appellant gave to police.

Appellant further suggests the morning and afternoon questionings

- 11 -

occurred in a continuum, and the afternoon *Miranda* warnings were insufficient to cure the lack of *Miranda* warnings in the morning. Appellant insists the police leveraged their extensive relationship with him and his family to neutralize Appellant's awareness of the environment as hostile, which resulted in his involuntary waiver of his rights. Appellant asserts his status as a juvenile and the absence of an interested adult deserve particular consideration in evaluating whether he effectively waived his *Miranda* rights. Appellant concludes this Court should reverse the order that denied Appellant's motion to suppress, vacate the dispositional order, and remand for further proceedings. We cannot agree.

"Our standard of review in addressing a challenge to a trial court's denial of a suppression motion is limited to determining whether the factual findings are supported by the record and whether the legal conclusions drawn from those facts are correct." *Commonwealth v. Williams*, 941 A.2d 14, 26 (Pa.Super. 2008) (*en banc*) (internal citations omitted).

> [W]e may consider only the evidence of the prosecution and so much of the evidence for the defense as remains uncontradicted when read in the context of the record as a whole. Where the record supports the findings of the suppression court, we are bound by those facts and may reverse only if the court erred in reaching its legal conclusions based upon the facts.

*Id.* at 27. The reviewing court's scope of review is limited to the evidentiary record of the pre-trial hearing on the suppression motion. *In re L.J.*, 622 Pa. 126, 79 A.3d 1073 (2013). "It is within the suppression court's sole province

as factfinder to pass on the credibility of witnesses and the weight to be given their testimony." ***Commonwealth v. Luczki***, 212 A.3d 530, 542 (Pa.Super. 2019) (quoting ***Commonwealth v. Clemens***, 66 A.3d 373, 378 (Pa.Super. 2013)). If appellate review of the suppression court's decision "turns on allegations of legal error," then the trial court's legal conclusions are nonbinding on appeal and subject to plenary review. ***Commonwealth v. Smith***, 164 A.3d 1255, 1257 (Pa.Super. 2017) (quoting ***Commonwealth v. Jones***, 121 A.3d 524, 526-27 (Pa.Super. 2015), *appeal denied*, 635 Pa. 750, 135 A.3d 584 (2016)).

Not every statement an individual makes during a police encounter is necessarily a response to an interrogation; an individual's volunteered or spontaneous utterances are admissible even without ***Miranda*** warnings. ***Commonwealth v. Gaul***, 590 Pa. 175, 180, 912 A.2d 252, 255 (2006); ***Commonwealth v. Garvin***, 50 A.3d 694, 698 (Pa.Super. 2012) (reiterating principle that spontaneous or "blurt out" incriminating statements made in course of small talk with authorities, even in custodial setting, are not *per se* subject to suppression). Generic questions seeking general information such as "name, height, weight, residence, occupation, *etc*." are not, as a general rule, considered part of an interrogation, because they "are not calculated to, expected to, or likely to elicit an incriminating response, or…asked with [the] intent to extract or an expectation of eliciting an incriminating [response]." ***Id.*** Absent coercive or improper tactics, no presumption of compulsion

attaches to an unwarned admission in this context. ***Commonwealth v. Charleston***, 16 A.3d 505, 520 (Pa.Super. 2011), *appeal denied*, 612 Pa. 696, 30 A.3d 486 (2011), *abrogated on other grounds*, ***In re L.J., supra*** (overruling unrelated prior law by limiting reviewing court's scope of review of suppression decision to evidentiary record of pre-trial hearing on motion to suppress).

On the other hand:

> Statements made during custodial interrogation are presumptively involuntary, unless the accused is first advised of [his] ***Miranda*** rights. Custodial interrogation is "questioning initiated by law enforcement officers after a person has been taken into custody or otherwise deprived of his freedom of action in any significant way." ***Miranda***, ***supra*** at 444, 86 S.Ct. at 1612, 16 L.Ed.2d at 706. [T]he ***Miranda*** safeguards come into play whenever a person in custody is subjected to either express questioning or its functional equivalent. Thus, [i]nterrogation occurs where the police should know that their words or actions are reasonably likely to elicit an incriminating response from the suspect. [I]n evaluating whether ***Miranda*** warnings were necessary, a court must consider the totality of the circumstances. In conducting the inquiry, we must also keep in mind that not every statement made by an individual during a police encounter amounts to an interrogation. Volunteered or spontaneous utterances by an individual are admissible even without ***Miranda*** warnings.
>
> > Whether a person is in custody for ***Miranda*** purposes depends on whether the person is physically denied of [his] freedom of action in any significant way or is placed in a situation in which [he] reasonably believes that [his] freedom of action or movement is restricted by the interrogation. Moreover, the test for custodial interrogation does not depend upon the subjective intent of the law enforcement officer interrogator. Rather, the test focuses on whether the individual being interrogated reasonably believes [his] freedom

- 14 -

of action is being restricted.

\*     \*     \*

Said another way, police detentions become custodial when, under the totality of the circumstances, the conditions and/or duration of the detention become so coercive as to constitute the functional equivalent of arrest.

Thus, the ultimate inquiry for determining whether an individual is in custody for **Miranda** purposes is whether there [was] a formal arrest or restraint on freedom of movement of the degree associated with a formal arrest. Under the totality of the circumstances approach, the following factors are relevant to whether a detention has become so coercive as to constitute the functional equivalent of a formal arrest: the basis for the detention; its length; its location; whether the suspect was transported against his…will, how far, and why; whether restraints were used; whether the law enforcement officer showed, threatened or used force; and the investigative methods employed to confirm or dispel suspicions.

**Williams, supra** at 30-31 (some internal citations and quotation marks omitted). **See also Commonwealth v. Yount**, 455 Pa. 303, 309, 314 A.2d 242, 246 (1974) (stating any question likely or expected to elicit confession constitutes "interrogation" under **Miranda**); **Commonwealth v. Turner**, 772 A.2d 970 (Pa.Super. 2001) (holding traffic stop where police placed Appellant in police car and questioned him about narcotic use constituted custodial interrogation).

Because **Miranda** warnings may inhibit persons from giving information, …they need be administered only after the person is taken into "custody" or his freedom has otherwise been significantly restrained. Unfortunately, the task of defining "custody" is a slippery one, and policemen investigating serious crimes [cannot realistically be

expected to] make no errors whatsoever. If errors are made by law enforcement officers in administering the prophylactic *Miranda* procedures, they should not breed the same irremediable consequences as police infringement of the Fifth Amendment itself. It is an unwarranted extension of *Miranda* to hold that a simple failure to administer the warnings, unaccompanied by any actual coercion or other circumstances calculated to undermine the suspect's ability to exercise his free will, so taints the investigatory process that a subsequent voluntary and informed waiver is ineffective for some indeterminate period. Though *Miranda* requires that the unwarned admission must be suppressed, the admissibility of any subsequent statement should turn in these circumstances solely on whether it is knowingly and voluntarily made.

*Oregon v. Elstad*, 470 U.S. 298, 309, 105 S.Ct. 1285, 293, 84 L.Ed.2d 222,

___ (1985) (internal citations and some quotation marks omitted).

[I]f a suspect makes a statement during custodial interrogation, the burden is on the Government to show, as a prerequisite to the statement's admissibility in the Government's case in chief, that the defendant voluntarily, knowingly and intelligently waived his rights.

The inquiry has two distinct dimensions. First[,] the relinquishment of the right must have been voluntary in the sense that it was the product of a free and deliberate choice rather than intimidation, coercion or deception. Second, the waiver must have been made with a full awareness both of the nature of the right being abandoned and the consequences of the decision to abandon it. Only if the totality of the circumstances surrounding the interrogation reveal both an uncoerced choice and the requisite level of comprehension may a court properly conclude that *Miranda* rights have been waived.

A determination of whether a juvenile knowingly waived his *Miranda* rights and made a voluntary confession is to be based on a consideration of the totality of the circumstances, including a consideration of the juvenile's age, experience, comprehension and

- 16 -

the presence or absence of an interested adult.

*In re B.T.*, 82 A.3d 431, 436 (Pa.Super. 2013) (quoting *In re T.B.*, 11 A.3d 500, 505-06 (Pa.Super. 2010) (internal citations and quotation marks omitted) (reiterating various factors to consider under totality of circumstances test for custodial interrogation)).

"*Elstad* stands for the rule that where an unwarned statement is not the product of police coercion, 'a careful and thorough administration' of a defendant's *Miranda* rights will render any subsequent statement voluntary and knowing, and therefore, admissible." *Charleston, supra* at 521. Thus, a prior *Miranda* violation does not necessarily disable a suspect from waiving *Miranda* rights in the future, after receiving the requisite warnings. *Commonwealth v. DeJesus*, 567 Pa. 415, 434, 787 A.2d 394, 405 (2001), *cert. denied*, 537 U.S. 1028, 123 S.Ct. 580, 154 L.Ed.2d 441 (2002), *abrogated on other grounds*, *Commonwealth v. Cousar*, 593 Pa. 204, 928 A.2d 1025 (2007), *cert. denied*, 553 U.S. 1035, 128 S.Ct. 2429, 171 L.Ed.2d 235 (2008) (referring to rescinded "relaxed waiver" rule utilized in *DeJesus* that allowed reviewing court to address merits of waived claims in capital direct appeals)).

Furthermore, the presence of an interested adult is also no longer a *per se* requirement during a police interview of a juvenile. *In the Interest of: J.N.W., a Minor*, 197 A.3d 274 (Pa.Super. 2018). The presence of an interested adult, however, is a factor in determining the voluntariness of a

juvenile's waiver of *Miranda* rights. *Commonwealth v. Smith*, 210 A.3d 1050, 1060 (Pa.Super. 2019) (holding: "[W]hether a juvenile defendant was afforded the opportunity to speak with an interested adult before waiving *Miranda* rights is but one factor in the totality-of-the-circumstances analysis"; likewise, low intelligence level does not necessarily render *Miranda* waiver defective); *Commonwealth v. Knox*, 50 A.3d 732, 747 (Pa.Super. 2012), *appeal denied*, 620 Pa. 721, 69 A.3d 601 (2013) (holding 17-year-old appellant knowingly, intelligently, and voluntarily waived *Miranda* rights, where police contacted father but father declined to accompany appellant, appellant had ninth-grade educational level, previous exposure to legal system, and no trouble reading *Miranda* waiver form, or appear to be under the influence of drugs or alcohol). *Cf. In the Interest of: N.B.*, 187 A.3d 941 (Pa.Super. 2018) (*en banc*) (affirming trial court's decision to suppress statements of juvenile made during police interview, where police quickly recited *Miranda* warnings and did not provide them in writing to 14-year-old juvenile, with developmental delays, who did not attach any significance to warnings; holding: "In light of his age, his intellectual challenges, the absence of an interested adult, and his belief that he was 'forced to be there by his mother and that he was directed to confess[,]' we conclude that [juvenile] did not knowingly waive his *Miranda* rights"); *J.N.W., supra* (affirming trial court's decision to suppress statements of juvenile made during police interview because 17-year-old juvenile did not voluntarily waive her *Miranda*

rights, where she was subjected to several different encounters with authorities which constituted custodial interrogation; questioning of juvenile at police department, although likely not custodial interrogation, was still coerced because juvenile's cooperation was induced with threatening references to possible charges against her and possible removal of her son from her care); *In re T.B., supra* at 507 (holding 15-year-old juvenile with low I.Q., did not knowingly and intelligently waive *Miranda* rights, where police failed to inform interested adult about juvenile's rights, and no interested adult attended interrogation). The relevant inquiry is whether the statement following proper warnings was voluntarily made under the totality of the circumstances. *In re B.T., supra*.

Instantly, police viewed a video recording from a surveillance camera that appeared to depict Appellant in the act of criminal trespass on a residential property at 439 East Marshall Street in Norristown. As a result, Detective Klinger, who knew Appellant well, suspected Appellant might have been involved in a reported burglary on East Marshall Street. Police asked Appellant's mother and his court-ordered supervisor to tell Appellant to come to the police station. Appellant arrived at the station at approximately 9:30 a.m. He did not appear to be under the influence of drugs or alcohol. When Appellant arrived, Detective Sowell brought him back into the Detective Division, which is an open office area divided into cubicles. Several detectives were present, including Detective Klinger. Detective Klinger and Detective

Sowell were wearing their badges and guns that day. Although entry to the office was restricted, exit was not, and Appellant was free to leave. He was not restrained with handcuffs or shackles. Appellant testified that he did not know if he could leave the way he came in, but the court found that testimony incredible, given Appellant's demeanor and his prior history of ten arrests by the Norristown police department, which employed Detective Sowell as its juvenile officer. The detectives did not place Appellant under arrest, but they were trying to gather information about two burglaries, one on Arch Street and the other on East Marshall Street.

At this time, Appellant was on juvenile probation and was wearing an electronic ankle bracelet that tracked his movements. The detectives were in the process of obtaining the GPS data to see if Appellant had been in the vicinity of the burglaries on Arch Street and East Marshall Street when they actually occurred. Detective Sowell told Appellant about the reports of burglaries of occupied homes and showed Appellant a still photo taken from the video recording that showed Appellant at the East Marshall Street residence.

The tone of the conversation between Detective Sowell and Appellant was casual. Detective Sowell tried to encourage Appellant to learn a trade or follow the example of his older brother who had just been admitted to college. After Detective Sowell spoke with Appellant for about ten minutes, Detective Klinger questioned Appellant about the burglary on Arch Street. Neither

detective issued ***Miranda*** warnings to Appellant. After seeing a photo of the Arch Street house, Appellant did not recognize it and was unsure if he had burglarized it. Detective Sowell said he did not think Appellant was responsible for that burglary.

Then, the detectives asked Appellant if he wanted to take a ride. Appellant agreed, went with the detective in an unmarked car, and drove past the Arch Street house. Appellant told the detectives he did not burglarize the Arch Street house. The detectives continued to talk to Appellant about what he planned to do with his life, and asked him questions only about their investigation of the burglary on Arch Street, not about the one on East Marshall Street. As they neared the site of the East Marshall Street burglary, however, Appellant pointed and disclosed, "I was in that one." The house Appellant pointed to was the one at 439 East Marshall Street, where he had been recorded on video. As they drove back to the police station by way of Moore Street, Appellant announced, "I was in this one and this one." Detective Klinger and Detective Sowell were surprised because they had no burglary reports on those houses (Moore Street and Airy Street). Because these burglaries were unreported, Detective Sowell was inclined to give Appellant the benefit of the doubt. After the detectives returned to the station with Appellant, they told Appellant he was free to leave, but they would contact him if they needed to speak to him again. They offered Appellant a ride home, but he preferred to walk and left the station.

Here, the detectives suspected Appellant might have been involved in the East Marshall Street burglary and left instructions for him to come to the station. While at the station, the tone of the conversation was casual. Appellant was not placed under arrest when he arrived at the police station, because the detectives were still trying to gather information about the Arch Street and the East Marshall Street burglaries. To that end, the detectives asked Appellant specific questions about his possible involvement in the burglary on Arch Street. No doubt, the questions about the Arch Street burglary were meant to produce an incriminating response; and Appellant should have been warned. *See Williams, supra*; *Yount, supra*. The detectives were also in the process of obtaining the GPS data from Appellant's electronic ankle bracelet. When Appellant did not recognize the Arch Street house in the photograph, the detectives invited him to take a ride with them.

Once Appellant entered a police vehicle, his freedom of action was more restricted. *See Williams, supra*. Although Appellant agreed to go with the detectives, at that point no reasonable person would feel free to exit the car at any time, particularly when the ride was meant to confirm his involvement in one or more crimes. *See id.* Therefore, the morning session with police rose to the level of a custodial interrogation, when Appellant was physically confined in the police vehicle, with detectives he knew and trusted, who took him around the area of the burglary on Arch Street. In the process of moving on to the East Marshall Street burglary location, Appellant implicated himself

in that burglary and two other, unreported burglaries. The trial court characterized Appellant's admissions as "blurt-outs." Yet, the surrounding setting arguably created a form of custodial pressure that led to Appellant's incriminating oral statements, given the reason for the interaction between the detectives and Appellant, the length of the interaction, its location, and the investigative methods employed to relax Appellant's guard. Appellant made these statements without the benefit of ***Miranda*** warnings.

The detectives subsequently obtained the GPS location data from Appellant's ankle cuff, which placed him in the general vicinity of the three houses he had identified. Detective Klinger first spoke with Appellant's mother in person about questioning Appellant again and informed her that they would give Appellant ***Miranda*** warnings and take a statement from him. Appellant's mother declined to accompany Appellant for any questioning.

When Appellant came back to the police station later that afternoon, Detective Klinger called Appellant's mother. She again declined to be present for questioning. Detective Klinger began to read ***Miranda*** warnings to Appellant's mother, but she stopped him before he had finished and gave permission for him to take Appellant's statement. Appellant declined to talk to his mother on the phone. Detective Klinger read Appellant his ***Miranda*** rights, confirmed Appellant understood his rights, and questioned him about the three burglaries. At the end of the questioning, Appellant was given an opportunity to review his statement and make changes or additions. His only

response was to say, "I apologize for what I did. I was thinking dumb. I just wanted money."

At the suppression hearing, Appellant disputed the detectives' testimony. Responding to Appellant's challenge to the warned statement made during the afternoon session, the trial court reasoned as follows:

> [The court] found [Appellant's] testimony regarding [the afternoon questioning] not credible based on his demeanor and the credible, contradictory testimony by Detectives Sowell, Klinger and Leeds. In contrast to the morning interview, Detective Klinger tried to get [Appellant's] mother to come to the station, but she declined. [Appellant] told Detective Klinger that he did not want his mother present during the interview. Detective Klinger gave [Appellant] his *Miranda* warnings and he made a knowing, intelligent and voluntary waiver of his constitutional rights. There is no basis for suppressing the statement [Appellant] gave in the afternoon.

(Trial Court Opinion at 20). During the afternoon session with Appellant, police twice told Appellant's mother they were about to take a statement from Appellant and started to read *Miranda* warnings to her over the phone until she stopped them. Appellant's mother made clear to police that she would not attend the session, gave permission for the inquiry, and rejected their offer to speak with Appellant. Thus, the absence of an interested adult did not invalidate Appellant's waiver of his *Miranda* rights. *See Smith, supra*. The afternoon session involved *Miranda* warnings and a confirmation that Appellant had made a knowing, intelligent and voluntary waiver of his constitutional rights. Moreover, the afternoon session with Appellant occurred approximately three hours after the morning session, which is sufficient time

- 24 -

to render this statement voluntary. **See DeJesus, supra**. Thus, the totality of the circumstances surrounding the afternoon interrogation revealed an independent choice and the requisite level of comprehension to support the trial court's conclusion that Appellant knowingly waived his **Miranda** rights and made a voluntary confession. **See In re B.T., supra**. Therefore, the court correctly denied suppression of Appellant's afternoon statement. Accordingly, we affirm.

Order affirmed.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary

Date: 10/31/19