J-S18006-21

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | | |
|---|---|---|
| COMMONWEALTH OF PENNSYLVANIA | : | IN THE SUPERIOR COURT OF |
| | : | PENNSYLVANIA |
| | : | |
| v. | : | |
| | : | |
| | : | |
| JAQUAN WILKERSON | : | |
| | : | |
| Appellant | : | No. 883 EDA 2020 |

Appeal from the Judgment of Sentence Entered October 11, 2019
In the Court of Common Pleas of Bucks County
Criminal Division at No(s): CP-09-CR-0005120-2018

BEFORE: PANELLA, P.J., McCAFFERY, J., and COLINS, J.[*]

MEMORANDUM BY PANELLA, P.J.: **FILED OCTOBER 26, 2021**

A jury convicted Jaquan Wilkerson of one count of involuntary manslaughter and three counts of recklessly endangering another person arising from the shooting death of Robert Colter, III. In the early stages of the investigation, police interrogated Wilkerson, who was 17 years old at the time, and ultimately let him leave with his father. The trial court suppressed the first seven minutes, 45 seconds of the interrogation, finding that the police had failed to properly advise Wilkerson of his rights. On appeal, Wilkerson argues the court erred, however, in refusing to suppress his later identification of his phone number and consent to search the contents of his mobile phone. Wilkerson also challenges the discretionary aspects of his sentence. We affirm.

_____

[*] Retired Senior Judge assigned to the Superior Court.

In the early evening of February 16, 2016, Robert Colter, III was gunned down while standing outside of his home in Bristol Borough, Pennsylvania. Witnesses described two masked shooters who fired a total of at least six shots at Colter. One of these shots hit Colter in the head, ultimately leading to his death. Witnesses noted that a red car was seen driving quickly away shortly after the shooting.

Less than a month later, Bristol Borough police received a complaint from Colter's family. Three young men were repeatedly driving by their home and holding their hands to resemble guns. The Colters gave a description of the vehicle involved, which led police to a vehicle being driven by Wilkerson on March 9, 2016.

Detective William Davis pulled behind Wilkerson's vehicle and activated his blue warning lights. He parked his police vehicle at an angle that would have prevented Wilkerson from leaving by reversing his vehicle, but did not otherwise block Wilkerson's path.

As he approached the vehicle, Detective Davis drew his firearm, but kept it at his side and not pointed at Wilkerson's vehicle or its occupants. Detective Davis directed the occupants to show their hands to him. After the occupants complied, Detective Davis re-holstered his weapon.

A crowd gathered around Wilkerson's car, and Detective Davis became concerned about safety. He suggested that Wilkerson accompany him to the police station to discuss the Colters' complaint. Wilkerson was driven by police

to the station, where his mobile phone was taken from him and placed in a bin at the station. Wilkerson was then placed in an interrogation room. He was left there for at least five hours until Detective David Hanks, who oversaw the investigation of Colter's death, arrived.

Wilkerson's father, Darius Wilkerson, was informed that his son was being questioned and subsequently arrived at the station. However, he was not permitted to speak with his son until the interview began.

The interview began at 9:47 p.m. After seven minutes, 45 seconds, Detective Davis informed Wilkerson that he was not under arrest and that he was free to leave if he so desired. Darius Wilkerson replied that he wished to clear his son's name and the interview continued. At approximately 10:28 p.m., Detective Hanks suggested a break in the interview.

The interview resumed at 10:42, with police asking Wilkerson for a DNA sample. Darius Wilkerson refused the sample, explaining that he wished to speak to an attorney before agreeing to doing so. Also, during the interview, Wilkerson provided police with number to his mobile phone. *See* Trial Court Opinion, 11/6/2020, at 18; *see also* N.T., 4/22/2019 (A.M.), at 20. The interview concluded at 10:59, and as Wilkerson and his father were leaving the room, the police asked if Wilkerson would consent to a search of his mobile phone. Darius Wilkerson voiced no objection, and Wilkerson signed a consent to the search of his phone.

Eventually, Detective Hanks's investigation led to Rodney Beaty, who told the detective an inculpatory story of the night of the shooting.[1] Beaty admitted that he and his cousin, Dwayne Lynch, had been involved with the shooting. Dwayne lived with his mother in Winder Village.

Beaty eventually revealed that earlier in the day of the shooting, he and Dwayne Lynch were driving around in Lynch's mother's red Chevrolet Sonic, drinking, smoking marijuana, and dealing heroin and cocaine. At some point, Wilkerson contacted Beaty through Facebook Messenger, asking to be picked up at a 7-11 in Croydon, Pennsylvania.

After Beaty and Lynch picked up Wilkerson, Wilkerson indicated that he wanted to rob Derron Thompson, another local drug dealer. When they passed Thompson on the street, Beaty parked the car nearby and waited while Lynch and Wilkerson armed themselves with firearms. Lynch and Wilkerson covered their faces and walked towards where they believed Thompson to be. Beaty heard multiple gunshots, and then Lynch and Wilkerson returned to the car in

_____

[1] Beaty's story is derived from his testimony at trial. **See** N.T., 4/25/2019 (A.M.), at 118-196; N.T., 4/26/2019 (A.M.), at 6-164, N.T., 4/26/2019 (P.M.), at 13-167. This testimony is technically irrelevant to the suppression court's ruling, as it was not part of the record before the suppression court. **See In the Interest of L.J.**, 79 A.3d 1073, 1085 (Pa. 2013) (holding an appellate court may only consider the evidence presented at the suppression hearing and may not review trial evidence in assessing a suppression court ruling). We recite it here, however, to provide context as to why Wilkerson sought to suppress his mobile phone number and evidence derived from the search of his phone.

a panic, yelling at Beaty to leave quickly. As they drove away, Wilkerson said, "I think we dropped one." N.T., 4/25/2019 (A.M.), at 28.

Detective Hanks checked Beaty's story against the historical cell site location data provided by the mobile phone carrier. The location data for Wilkerson's and Lynch's phones on the night of the shooting corresponded closely to the story told by Beaty.[2]

As noted previously, the trial court suppressed the first seven minutes and forty-five seconds of Wilkerson's interrogation. However, it found that Wilkerson's statement acknowledging his phone number, as well as his consent to search his mobile phone, were admissible.

On appeal, Wilkerson contends this was error. Our Court's standard of review for a suppression issue is deferential to the suppression court's findings of fact, but not its conclusions of law:

> [We are] limited to determining whether the suppression court's factual findings are supported by the record and whether the legal conclusions drawn from those facts are correct. Because the Commonwealth prevailed before the suppression court, we may consider only the evidence of the Commonwealth and so much of the evidence for the defense as remains uncontradicted when read in the context of the record as a whole. Where the suppression court's factual findings are supported by the record, the appellate

---

[2] On March 22, 2016, the police had obtained a court order ("the March 22nd order") authorizing the disclosure of cell site tower information related to Wilkerson's cellular telephone number, 267-912-2582, for the period of February 16, 2016, to February 17, 2016, pursuant to the Pennsylvania Wiretapping and Electronic Surveillance Control Act, 18 Pa.C.S.A. § 5743(c). Subsequently, they sought and obtained a search warrant on July 11, 2018 ("the July 11th search warrant") for Wilkerson's cellphone for that same period. *See* N.T., 4/3/2019, at 179.

court is bound by those findings and may reverse only if the court's legal conclusions are erroneous. Where ... the appeal of the determination of the suppression court turns on allegations of legal error, the suppression court's legal conclusions are not binding on an appellate court, whose duty it is to determine if the suppression court properly applied the law to the facts. Thus, the conclusions of law of the courts below are subject to plenary review.

**Commonwealth v. Smith**, 164 A.3d 1255, 1257 (Pa. Super. 2017) (internal citations omitted).

Here, Wilkerson identifies two separate suppression issues in his "Statement of Questions Presented." **See** Appellant's Brief, at 8. However, in his argument section, Wilkerson states both claims "can be combined into a single argument as the resulting search of [Wilkerson]'s phone and cell data naturally flows from the initial [Wilkerson] statement and consent from March 9, 2016." **Id.**, at 19. Accordingly, our analysis will reflect this merged argument.

Wilkerson contends that the court erred in failing to suppress the search of his phone because it was the product of an unlawful seizure. **See** Appellant's Brief, at 21. Initially, it merits mentioning that Wilkerson repeatedly highlights the fact that the trial court suppressed the first seven minutes and forty-five seconds of his March 9, 2016 statement to police. **See id.**, at 19, 22. This is an underlying tone of his argument – the court suppressed part of his statement and consequently, the search should be invalidated. He specifically takes issue with four findings made by the trial court to support its conclusion: (1) Wilkerson's detention; (2) the validity of his consent; (3) inevitable

discovery; and (4) the March 22nd order and the July 11th search warrant. Based on the nature of claims, we address the first two findings together.

As to the detention, Wilkerson asserts that based on the totality of the circumstances, any reasonable person in his position at the time of his detention would have believed that his freedom was restricted.[3] Wilkerson avers that Detective Davis did not possess probable cause or reasonable suspicion when he seized and detained Wilkerson and the detective's actions were "solely" based on a hunch that Wilkerson was involved in the shooting. *Id.*, at 22. Wilkerson further maintains that if the encounter was reasonable, he would not have been patted down with the officer's gun drawn and placed in a police vehicle. Instead, he would have been permitted to drive himself to the police station, and his phone would not have been immediately seized and detained by the police. *See id.*

As for his consent, Wilkerson argues that his permission to search the phone was not valid where he was detained for over five hours until the police questioned him about the murder. Further, he claims his "phone was never going to be returned until he consented to its search." *Id.*, at 23. Wilkerson also complains that the evidence produced from his consent of the phone

---

[3] The issue of whether police possessed probable cause or reasonable suspicion to detain or seize Wilkerson was not raised until the day before trial was to begin. *See* N.T., 4/22/2019, at 27. The trial court requested defense counsel state the basis of his oral motion on the record and then heard testimony from Detective Davis regarding the matter.

flowed from the purportedly improper detention, stating that he "lost all of his freedom when Detective Davis parked behind him and activated his warning lights[.]" *Id.* He maintains that his "consent was obtained as a direct result of the continuing unlawful arrest and detention[.]" *Id.*

Detective Davis's interaction with Wilkerson on the street implicated Wilkerson's liberty and privacy interests as guaranteed by the Fourth Amendment to the United States Constitution and Article I, Section 8 of the Pennsylvania Constitution. *See Commonwealth v. Smith*, 172 A.3d 26, 31 (Pa. Super. 2017). Fourth Amendment jurisprudence recognizes three levels of interactions between police officers and citizens: (1) a mere encounter; (2) an investigative detention; and (3) a custodial detention. *See id.*, at 32. A mere encounter need not be supported by any level of suspicion because it carries no official compulsion for a citizen to stop or respond. *See Commonwealth v. Raglin*, 178 A.3d 868, 871 (Pa. Super. 2018), *appeal denied*, 187 A.3d 913 (Pa. 2018). An investigative detention must be supported by reasonable suspicion because it subjects a suspect to a stop and a period of detention but does not constitute an arrest. *See Commonwealth v. Baldwin*, 147 A.3d 1200, 1202 (Pa. Super. 2016). Finally, a custodial detention or an arrest must be supported by probable cause. *See Commonwealth v. Collins*, 950 A.2d 1041, 1046 (Pa. Super. 2008).

Wilkerson essentially argues that his encounter with police rose to the level of a custodial detention that included a coercive interrogation. "A law

enforcement officer must administer *Miranda* warnings prior to custodial interrogation." *Commonwealth v. Baker*, 24 A.3d 1006, 1019 (Pa. Super. 2011) (citation omitted). "Custodial interrogation has been defined as questioning initiated by law enforcement officers after a person has been taken into custody or otherwise deprived of his [or her] freedom of action in any significant way." *Id.* (citation and quotation marks omitted).

Here, while the record is not entirely clear on the specific details, it is clear the suppression court found that Detective Davis's interaction with Wilkerson was not a mere encounter. Given that the court suppressed the portion of the interrogation that preceded the *Miranda* warning, it clearly agreed with Wilkerson's characterization of the initial interaction. However, this does not necessarily entail that Wilkerson was entitled to suppression of the whole interview.

Instead, our state and federal constitutions provide that police can cure a *Miranda* violation and continue questioning the suspect under certain circumstances:

> Because *Miranda* warnings may inhibit persons from giving information, ... they need be administered only after the person is taken into "custody" or his freedom has otherwise been significantly restrained. Unfortunately, the task of defining "custody" is a slippery one, and policemen investigating serious crimes [cannot realistically be expected to] make no errors whatsoever. If errors are made by law enforcement officers in administering the prophylactic *Miranda* procedures, they should not breed the same irremediable consequences as police infringement of the Fifth Amendment itself. It is an unwarranted extension of *Miranda* to hold that a simple failure to administer the warnings, unaccompanied by any actual coercion or other

circumstances calculated to undermine the suspect's ability to exercise his free will, so taints the investigatory process that a subsequent voluntary and informed waiver is ineffective for some indeterminate period. Though *Miranda* requires that the unwarned admission must be suppressed, the admissibility of any subsequent statement should turn in these circumstances solely on whether it is knowingly and voluntarily made.

*Oregon v. Elstad*, 470 U.S. 298, 309 (1985) (internal citations and some quotation marks omitted). *See also Commonwealth v. DeJesus*, 787 A.2d 394, 405 (Pa. 2001), *cert. denied*, 537 U.S. 1028, *abrogated on other grounds, Commonwealth v. Cousar*, 928 A.2d 1025 (Pa. 2007).

*Elstad* stands for the rule that where an unwarned statement is not the product of police coercion, a careful and thorough administration of a defendant's *Miranda* rights will render any subsequent statement voluntary and knowing, and therefore, admissible. Thus, a prior *Miranda* violation does not necessarily disable a suspect from waiving *Miranda* rights in the future, after receiving the requisite warnings.

*In the Interest of N.M.*, 222 A.3d 759, 772 (Pa. Super. 2019) (citations and quotation marks omitted), *appeal denied*, 229 A.3d 562 (Pa. 2020).

Therefore, even if the first seven minutes, 45 seconds of the interrogation is considered improper due to the lack of *Miranda* warnings, we must still determine, under all the circumstances, whether Wilkerson's subsequent statements were made in a voluntary and knowing manner. Importantly, "the presence of an interested adult is also no longer a *per se* requirement during a police interview of a juvenile. The presence of an interested adult, however, is a factor in determining the voluntariness of a

juvenile's waiver of *Miranda* rights." *Id.*, at 772 (Pa. Super. 2019) (citations omitted).

We can find no fault in the suppression court's determination that Detective Davis's initial interaction with Wilkerson at some point evolved into an investigative detention, as the detective unholstered his gun and asked the occupants of the car to show their hands. *See Baldwin*. This was not a situation in which a reasonable person would believe "that he was at liberty to ignore the police presence and go about his business." *Commonwealth v. Witherspoon*, 756 A.2d 677, 680 (Pa. Super. 2000). However, the detective's request was supported by reasonable suspicion as his purpose for the interaction was to question them about the report made by the victim's family concerning the drive-by gun signs.

In assailing the trial court's ruling as to his argument that the police possessed no level of suspicion, Wilkerson ignores the important fact that the Colters had complained about harassment. The complaint was made shortly before Detective Davis observed Wilkerson. The victim's mother had specifically identified Wilkerson as one of the individuals and she described a small, gray car that matched the vehicle Wilkerson was driving on the day in question. Nevertheless, it also merits highlighting that once the detective observed their hands, he put his gun back in his holster.

Wilkerson's freedom of action became more restricted when the detective asked Wilkerson and his friends to go to the police station to discuss

the complaint based on the hostile crowd that was forming and they agreed. Although Wilkerson may have agreed to go, no reasonable person in his position would feel free to exit the police car they were placed in after Detective Davis's initial show of authority.

Nevertheless, while Wilkerson was in the interview room for several hours, he was not handcuffed or restrained. He also was not locked in that room and was free to get up and walk around the police station. *See* N.T., 4/22/2019, at 33. As found by the trial court, there was no evidence that he was threatened or subject to any intimidating actions designed to affect his ability to make a voluntary waiver of his rights. Likewise, the trial court noted the detectives were non-confrontational, and the tone of the interview was conversational. *See* N.T., 4/10/2019, at 11.

The ambiguity in Wilkerson's status is reflected in the trial court's finding that the Commonwealth "failed to meet its burden under the law to clearly establish [Wilkerson]'s status until seven minute and 45 seconds into the interview when Detective Hanks says, you're not under arrest for anything, we're just talking to you. If you want to leave and stop talking, you can stop talking at any time you want." N.T., 4/10/2019, at 14. The court recognized that while his father may have been informed of the circumstances, Wilkerson was not fully advised of his rights until Detective Hanks made those statements. As such, the court properly suppressed any statements up until that point in the interview and any evidence that subsequently flowed from

those statements in recognition that Wilkerson was not fully apprised of his rights until that seven minute and 45 second mark.

The remainder of the interview occurred after Detective Davis informed Wilkerson he was free to leave. We therefore must determine whether the suppression court erred in concluding that Wilkerson's subsequent statements were made voluntarily and knowingly. First, we note the conditions concerning the interview were noncoercive: (1) Wilkerson was not restrained in any manner; (2) the police did not try to speak with him until his father was present; and (3) the conversation was nonconfrontational. Neither Wilkerson nor his father raised an objection to the subsequent questioning once Detective Hanks told them Wilkerson was not under arrest and could stop talking and leave the station.

Second, the suppression court was entitled to rely on Wilkerson's refusal supply a DNA sample as evidence that Detective Davis's warning sufficiently cured the prior presumptively coercive atmosphere. When the police asked Wilkerson for a DNA sample, Wilkerson's father objected and invoked his son's right to counsel for that request. *See* Trial Court Opinion, 11/6/2020, at 15; *see also* N.T., 4/3/2019, at 90 The police did not attempt any more requests regarding Wilkerson's DNA. The father's objection demonstrated an understanding that Wilkerson was free to object to any requests made by the police.

Third, Wilkerson left with his father and was not arrested until over two years later. While not conclusive proof of the absence of coercion, this circumstance certainly bolsters the court's conclusion that Wilkerson was not being treated as being under arrest. Based on these facts, we conclude that the record supports the trial court's factual findings and that its legal conclusion that Wilkerson made an independent, voluntary statement with the "requisite level of comprehension[.]" ***In the Interest of N.M.***, 222 A.3d at 775-776.

As for Wilkerson's challenge to his consent for the police to search his cell phone, we note "[a] search warrant is not required where a person with the proper authority unequivocally and specifically consents to the search." ***Commonwealth v. Acosta***, 815 A.2d 1078, 1083 (Pa. Super. 2003) (citations and internal quotation marks omitted). "To establish a valid consensual search, the Commonwealth must first prove that the consent was given during a legal police interaction." ***Commonwealth v. Bell***, 871 A.2d 267, 273 (Pa. Super. 2005) (citation omitted). Based on our previous determination that Detective Davis's initial restraint of Wilkerson's freedom was based upon reasonable suspicion, our focus turns to the voluntariness of Wilkerson's consent.[4]

---

[4] We note that Wilkerson does not challenge the breadth of the search.

"To establish a voluntary consensual search, the Commonwealth must prove that a consent is the product of an essentially free and unconstrained choice - not the result of duress or coercion, express or implied, or a will overborne - under the totality of the circumstances." ***Commonwealth v. Randolph***, 151 A.3d 170, 179 (Pa. Super. 2016) (citation and internal quotation marks omitted).

Here, the detectives asked Wilkerson and his father if they could search Wilkerson's phone. Wilkerson consented to the search and both he and his father signed the consent form. The parties stipulated that the detective read the entire form to Wilkerson in the presence of his father and Wilkerson signed the form after the interview concluded. The trial court found the consent was voluntary. ***See*** N.T., 4/10/2019, at 17-18. We agree with the trial court's conclusion and find Wilkerson's sparse argument does not persuade us otherwise. It merits highlighting that Wilkerson and his father were aware of their rights when they did not consent to the detective's request for a DNA test. Accordingly, Wilkerson fails to demonstrate that his consent was not voluntarily given.[5]

Lastly, Wilkerson asserts that even though the court did not consider the suppressed statements in its review of the March 22nd order and the July

---

[5] Because we concluded that Wilkerson's arguments concerning his detention and consent are unavailing, we need not address the portion of his argument which addressed the court's alternate theory of inevitable discovery. ***See*** Trial Court Opinion, 11/6/2020, at 21-22.

- 15 -

11th search warrant, the court did consider his subsequent statement in which he provided his phone number to police. **See** Appellant's Brief, at 24-25. Wilkerson contends that if we conclude his consent was invalid, then his identification of the cell number as his own should be deemed invalid as well. **See id.**, at 25. Wilkerson baldly asserts that the remaining facts "do not rise to the level of reasonable suspicion or probable cause to justify the court order and search warrant[.]" **Id.**

Wilkerson's argument fails for several reasons. First, we previously determined that the court did not err in finding that Wilkerson gave voluntary consent for the search of his phone, which included his phone number. Second, he does not reference any supporting case law to suggest the remaining portions of the order and search warrant should be deemed invalid and, therefore, is underdeveloped. **Commonwealth v. Gould**, 912 A.2d 869, 873 (Pa. Super. 2006). ("An appellate brief must provide citations to the record and to any relevant supporting authority. The court will not become the counsel for an appellant and will not, therefore, consider issues … which are not fully developed[.]"). Therefore, this argument warrants no relief. In light of all of the above, Wilkerson's arguments against the suppression court's ruling merit no relief.

Wilkerson's second claim is a challenge to the discretionary aspects of his sentence. Challenges to the discretionary aspects of sentencing do not

guarantee a petitioner's right to our review. *See Commonwealth v. Allen*, 24 A.3d 1058, 1064 (Pa. Super. 2011).

> An appellant challenging the discretionary aspects of his sentence must invoke this Court's jurisdiction by satisfying a four-part test: (1) whether appellant has filed a timely notice of appeal, *see* Pa.R.A.P. 902 and 903; (2) whether the issue was properly preserved at sentencing or in a motion to reconsider and modify sentence, *see* Pa.R.Crim.P. [720]; (3) whether appellant's brief has a fatal defect, Pa.R.A.P. 2119(f); and (4) whether there is a substantial question that the sentence appealed from is not appropriate under the Sentencing Code.

*Commonwealth v. Swope*, 123 A.3d 333, 337 (Pa. Super. 2015) (citation omitted).

Here, Wilkerson filed a timely notice of appeal, and his brief included a statement of reasons relied upon for allowance of appeal, as is required by Pa.R.A.P. 2119(f). *See* Appellant's Brief, at 9. He also preserved the issue in a post-sentence motion. *See* Post Trial Motions, 10/18/2019, at ¶¶ 3-7. Therefore, we must determine whether Wilkerson has raised a substantial question.

"The determination of what constitutes a substantial question must be evaluated on a case-by-case basis." *Commonwealth v. Prisk*, 13 A.3d 526, 533 (Pa. Super. 2011). "A substantial question exists only when the appellant advances a colorable argument that the sentencing judge's actions were either: (1) inconsistent with a specific provision of the Sentencing Code; or (2) contrary to the fundamental norms which underlie the sentencing process." *Id.* (internal citations omitted). "[A]n allegation that the sentencing

- 17 -

court failed to consider mitigating factors generally does not raise a substantial question for our review." ***Commonwealth v. Rhoades***, 8 A.3d 912, 918-919 (Pa. Super. 2010) (citation omitted). Nevertheless, a claim that the trial court failed to consider mitigating evidence when imposing consecutive statutory maximum sentences, raises a substantial question. ***See Commonwealth v. Caldwell***, 117 A.3d 763, 770 (Pa. Super. 2015) (*en banc*). Moreover, an allegation that the sentence was unreasonable because it was outside the sentencing guidelines raises a substantial question. ***See Commonwealth v. Lawrence***, 960 A.2d 473, 478 (Pa. Super. 2008).

As presented, Wilkerson identifies several reasons why he believes he has raised a substantial question: (1) the court failed to consider that his prior record score was zero; (2) the court failed to consider that he was a juvenile at the time of the offense; (3) the court based his sentences on the seriousness of the crime charged as opposed to the jury's determination of the crimes committed; (4) the court failed to differentiate Wilkerson's conduct from similarly situated defendants convicted of similar offenses; (5) the court failed to differentiate him from the most culpable of misconduct, co-defendant Lynch, who received the exact same sentence; (6) the court failed to consider the sentencing guidelines for standard and aggravated ranges of where Wilkerson received consecutive, statutory maximum sentences for each conviction; and (7) the court failed to give meaningful consideration to certain mitigating evidence. ***See*** Appellant's Brief, at 26-27. Taken as a whole, we

conclude Wilkerson has raised a substantial question, and we proceed to examine the merits of his sentencing challenge.

We have a deferential standard of review for discretionary aspects of the sentence claims:

> Sentencing is a matter vested in the sound discretion of the sentencing judge, and a sentence will not be disturbed on appeal absent a manifest abuse of discretion. In this context, an abuse of discretion is not shown merely by an error in judgment. Rather, the appellant must establish, by reference to the record, that the sentencing court ignored or misapplied the law, exercised its judgment for reasons of partiality, prejudice, bias or ill will, or arrived at a manifestly unreasonable decision.

**Commonwealth v. Shugars**, 895 A.2d 1270, 1275 (Pa. Super. 2006).

Wilkerson first claims his sentence was unreasonable and excessive because the jury's verdict found that he acted with a reckless *mens rea* and that he did not act intentionally or knowingly with respect to the victim's death, therefore, he complains that "[i]t is difficult to justify the maximum possible sentence on the basis of reckless conduct[.]" Appellant's Brief, at 31. He also complains that his sentence is exactly the same as Lynch's sentence, who was ten years older and had a significant prior criminal history. **See id.** Additionally, Wilkerson asserts the court disregarded certain mitigating factors present at the time of sentencing. **See id.**, at 32. He points out that he was a minor at the time of the shooting and had no prior criminal history. Wilkerson states the court ignored character witness letters submitted by his family and friends. **See id.** He alleges he presented sufficient mitigation evidence to justify some amount of reduction in time. **See id.** Wilkerson concludes that

the trial court provided a number of factors to support the sentence "but little to no explanation as to how or why those factors justified a maximum sentence." *Id.*, at 32-33.

While the court is required to consider the ranges set forth in the sentencing guidelines, it is not bound by them. *See Commonwealth v. Yuhasz*, 923 A.2d 1111, 1118 (Pa. 2007). The court may depart from the "guidelines, if necessary, to fashion a sentence which takes into account the protection of the public, the rehabilitative needs of the defendant, and the gravity of the particular offense as it relates to the impact on the life of the victim and the community[.]" *Commonwealth v. Eby*, 784 A.2d 204, 206 (Pa. Super. 2001) (citation omitted); *see also* 42 Pa.C.S.A. § 9721(b).

If the court imposes a sentence outside the guideline ranges, it must place adequate reasons for the deviation in the record. *See Commonwealth v. P.L.S.*, 894 A.2d 120, 129-130 (Pa. Super. 2006). Nevertheless, we only vacate an outside-the-guidelines sentence if the "sentence is unreasonable[.]" 42 Pa.C.S.A. § 9781(c)(3).

> In making this "unreasonableness" inquiry, we consider:
>
> (1) The nature and circumstances of the offense and the history and characteristics of the defendant.
>
> (2) The opportunity of the sentencing court to observe the defendant, including any presentence investigation.
>
> (3) The findings upon which the sentence was based.
>
> (4) The guidelines promulgated by the commission.

42 Pa.C.S.A. § 9781(d).

Here, the court had the benefit of a presentence investigation report ("PSI"). *See* N.T., 10/11/2019, at 63. The court heard impact statements from the victim's father, mother, and youngest brother as well as Darius Wilkerson at sentencing. *See* N.T., 10/11/2019, at 66-80, 87-89. Wilkerson's sentencing memorandum was made part of the record, including eight character letters and a psychological report by Dr. John Markley. *See id.*, at 86. Additionally, the sentencing memorandum indicated Wilkerson was currently serving a three-and-a-half to seven-year sentence for an unrelated robbery offense that occurred after the date of the offense at issue. *See* Sentencing Memorandum, 10/4/2019, at unnumbered 2. Wilkerson declined his right to allocution, and he was colloquied as to that decision. *See id.*, at 89-91.

The statutory maximum for the involuntary manslaughter offense is five years. *See* 18 Pa.C.S.A. § 2504(b); 18 Pa.C.S.A. § 1104(1). Wilkerson had a prior record score of zero. The offense gravity score for the manslaughter offense was a six. The Pennsylvania Sentencing Guidelines provide a standard sentencing range of three to twelve months, with an aggravated range of an additional six months for the conviction. *See* N.T., 10/11/2019, at 82. Likewise, the statutory maximum for REAP is two years. *See* 18 Pa.C.S.A. § 2702; 18 Pa.C.S.A. § 1104. The offense gravity score is a three. The Sentencing Guidelines provide a standard range of restorative sanctions to one month, with an aggravated range of an additional three months. *See* N.T.,

10/11/2019, at 82. As noted above, the court imposed a sentence of two and a half to five years' incarceration for the involuntary manslaughter conviction, followed by two consecutive terms of one to two years for two of the REAP offenses. *See id.*, at 103-104. Accordingly, the court imposed a sentence that exceeded the aggravated range, but not beyond the maximum sentence permitted by law.

At the hearing, the court explained its rationale for imposing such a sentence, acknowledging that Wilkerson's young age at the time of the offense was "a powerful factor which must be considered" as well as his history and "the difficulties he [has] faced in life." *Id.*, at 101. The court further stated:

> But I also consider the fact that every effort has been made in the juvenile system to rehabilitate him. I consider that the record from the trial, from the presentence investigation, all confirm this strong identification with criminal activity and the diagnosis of him having an antisocial personality, as well as other diagnoses. And Dr. Marky opines, and it [is] known to anyone in the justice system, that [Wilkerson]'s need for a long-term rehabilitation is clear.
>
> It's clear from the decisions he made before this offense happened and it [is] clear from the decisions he [has] made while incarcerated. And putting aside the other conviction for which he [is] serving a sentence, he [has] been separately punished for that and held accountable for that.
>
> I [am] required under the law to consider the protection of the public and I do consider that in imposing [this] sentence. I consider the gravity of the offense. Certainly … this is the most egregious of manslaughter cases. A deadly weapon was used. This is not an accident. This is not negligent. This is reckless conduct.
>
> A firearm was used and it serves no purpose other than to harm another human being or, in fact, kill another human being or kill something. I clearly am supposed to consider the impact of

this offense on the community and the victims. An offense could have no greater impact than a shooting in a neighborhood when other people are present, nor could it have greater impact on the victim.

Finally, as I said, I consider the rehabilitative needs of [Wilkerson] as evidence of his history and strong identification with criminal activity. Those are the factors I'm required to consider under the law, not the message it sends to the community, but what I must do to protect the public, what I must do to acknowledge the gravity of the offense with respect to the community and the victim as well as the rehabilitative needs as to [Wilkerson.]

*Id.*, at 101-103.

Wilkerson's argument fails for several reasons. We first observe that there is no legal authority to support Wilkerson's position that it was impermissible for the court to impose the maximum sentence because the jury found his actions represented the recklessness element of involuntary manslaughter conviction and not the intent element of murder. Furthermore, the court did not impose a statutory maximum for first degree or third degree murder; rather, it imposed the corresponding statutory maximum sentence for his involuntary manslaughter conviction. It also merits repeating that the evidence established Wilkerson and Lynch shot their firearms multiple times into a crowd of people and one of the bullets struck the victim's head. As the trial court pointed out, the victim's death was not accident or the result of negligent acts; a deadly weapon was used.

Next, Wilkerson also provides no authority for his argument that it was improper for the court to sentence both him to the same sentence as Lynch

given their different backgrounds. Our research does not reveal any provision of the Pennsylvania Sentencing Code that requires the prior criminal history and sentence of a co-defendant being a relevant factor at a defendant's sentencing. Sentencing is an individualized process. **See Commonwealth v. Baker**, 72 A.3d 652 (Pa. Super. 2013). The court addressed both co-defendants separately at the sentencing hearing and provided individualized explanations for their sentences. **See** N.T., 10/11/2019, at 56-59 (Lynch), 101-103 (Wilkerson). Therefore, this assertion has no support in the Sentencing Code or record.

Third, while Wilkerson complains that the court did not consider certain mitigating factors, it is evident the court did consider those factors, especially his age, but chose not to give those mitigating factors as much weight as Wilkerson would have preferred. "We cannot re-weigh the sentencing factors and impose our judgment in the place of the sentencing court." **Commonwealth v. Macias**, 968 A.2d 773, 778 (Pa. Super. 2009). Moreover, the court had the benefit of the PSI and we can reasonably infer the court considered those factors. **See Commonwealth v. Bullock**, 170 A.3d 1109, 1126 (Pa. Super. 2017).

Lastly, to the extent Wilkerson alleges the court did not sufficiently explain why the factors that it highlighted justified a maximum sentence, we observe the court detailed the substantial reasons for the sentence in satisfaction of Sections 9721(b) and 9781(d). Particularly, the record makes

clear the court considered Wilkerson's rehabilitative needs, the gravity of the offense as it related to the victim and the community, and the protection of the public. *See* N.T., 10/11/2019, at 101-103. Therefore, the trial court did not abuse its discretion in imposing Wilkerson's sentence, and that his challenge to the discretionary aspects of his sentence is without merit.

Judgment of sentence affirmed.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary

Date: 10/26/2021