J-S41006-24

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT O.P. 65.37**

COMMONWEALTH OF PENNSYLVANIA   :    IN THE SUPERIOR COURT OF
  :        PENNSYLVANIA
  :
v.   :
  :
  :
  :
LORON IRVING   :
  :
Appellant   :    No. 425 EDA 2024

Appeal from the Judgment of Sentence Entered January 8, 2024
In the Court of Common Pleas of Lehigh County Criminal Division at
No(s): CP-39-CR-0001400-2022

BEFORE: MURRAY, J., KING, J., and SULLIVAN, J.

MEMORANDUM BY MURRAY, J.:            **FILED DECEMBER 05, 2024**

Loron Irving (Appellant) appeals from the judgment of sentence entered following his conviction by a jury of first-degree murder, and by the trial court of persons not to possess firearms (PPF).[1] After careful review, we affirm.

In the early morning hours on February 24, 2022, Appellant patronized Big Woody's Bar in Allentown, Pennsylvania. Appellant went to the bar with his friend, Clarence Brown (Brown). At around 2:00 a.m., the bar announced "last call" and Appellant exited the bar. Appellant smoked a cigarette in the parking lot while waiting for Brown, who was arguing with other bar patrons in the parking lot.

_____

[1] *See* 18 Pa.C.S.A. §§ 2502(a), 6105(a)(1).

Appellant subsequently interjected himself into the argument, exchanging words with the victim, Anthony Lee Rodgers (Rodgers or the victim). During the argument, Rodgers walked away and briefly entered a vehicle approximately seven parking spaces away from Appellant. At this time, Appellant removed a firearm from his clothing, and held it, pointed down, along his right side. Rodgers initially began walking in Appellant's direction, but then began walking away. At the time, Rodgers and Appellant were separated by a parked vehicle.

Appellant called out to Rodgers, who began walking towards Appellant. Appellant immediately raised his firearm and shot Rodgers in the chest. Appellant then fired another shot at Rodgers, striking him in the torso and arm. As Rodgers attempted to run away from Appellant, Appellant fired an additional six shots at Rodgers' back, until Rodgers collapsed. Appellant then quickly walked away from the scene. Rodgers, who was found to be carrying only brass knuckles, died from his injuries.

The entire incident was captured on high-definition surveillance videos, which police obtained from the Allentown Commons Mall. Appellant subsequently was identified as the perpetrator, and police arrested him. Appellant filed an omnibus pretrial suppression motion to suppress statements he made to police, which the trial court denied on November 14, 2022.

Appellant was tried before a jury and the trial court from October 31, 2023, through November 3, 2023. The jury convicted Appellant of first-degree

murder; the trial court convicted Appellant of PPF. On January 8, 2024, the trial court sentenced Appellant to life in prison for his murder conviction, and a consecutive prison term of 8-20 years for his conviction of PPF. However, the sentencing order for Count 1 was titled: "Criminal Homicide F1 2501(a)." Sentencing Order (murder), 10/8/24. The sentencing order for Appellant's PPF conviction did not indicate whether Appellant was eligible for sentencing under the Recidivism Risk Reduction Incentive Act (RRRI), 61 Pa.C.S.A. §§ 4501-4512.

On January 10, 2024, the trial court entered a corrected sentencing order regarding Appellant's sentence for PPF. The corrected sentencing order indicated Appellant is not eligible for sentencing under the RRRI. Corrected Sentencing Order (PPF), 1/10/24, at 1. On January 30, 2024, Appellant timely filed a notice of appeal from the trial court's January 8, 2024, judgment of sentence. On January 31, 2024, the trial court ordered Appellant to file Pa.R.A.P. 1925(b) concise statement of matters complained of on appeal.[2] Trial Court Order, 1/31/24.

Notwithstanding Appellant's appeal, on January 31, 2024, the trial court entered a corrected sentencing order pertaining to Appellant's first-degree murder sentence. This corrected sentencing order changed the heading of the

_____

[2] Appellant timely complied with the trial court's order.

sentencing sheet from "Ct. 1 Criminal Homicide F1 2501(a)" to "Ct. 1 Murder Of The First Degree H1 2502(a)." Corrected Sentencing Order, 1/31/24, at 1.

We initially observe that, "after an appeal is taken … the trial court … may no longer proceed further in the matter." Pa.R.A.P. 1701(a); *see also* 42 Pa.C.S.A. § 5505 (stating that a court may modify any order within thirty days after its entry so long as no appeal from such order has been taken). "After an appeal is taken," the trial court may "[g]rant reconsideration of the order which is the subject of the appeal," if "an application for reconsideration of the order is filed in the trial court … within the time provided or prescribed by law[.]" Pa.R.A.P. 1701(b)(3). The trial court must enter an order expressly granting reconsideration "of such prior order is filed in the trial court … within the time prescribed by these rules for the filing of a notice of appeal." Pa.R.A.P. 1701(b)(3). Thus, a court may not modify an order after thirty days have elapsed unless a party has filed a timely motion for reconsideration and the court expressly grants the motion before an appeal is taken. ***Commonwealth v. Haughwout***, 816 A.2d 247, 249-50 (Pa. Super. 2003),

Our review discloses the trial court's January 10, 2024, corrected sentencing order pertained only to Appellant's PPF conviction and was entered within 30 days of Appellant's judgment of sentence and prior to any appeal. *See* 42 Pa.C.S.A. § 5505. Thus, we discern no error by the trial court with regard to the court's January 10, 2024, corrected sentencing order.

The trial court filed its final corrected sentencing order on January 31, 2024, **after** Appellant timely filed his notice of appeal. ***See*** 42 Pa.C.S.A. § 5505 ("Except as otherwise provided or prescribed by law, a court upon notice to the parties may modify or rescind any order within [thirty] days after its entry, notwithstanding the prior termination of any term of court, **if no appeal from such order has been taken or allowed**" (emphasis added)). Nevertheless, this Court has recognized an exception to Section 5505's 30-day time limit for the correction of "clear clerical errors." ***Commonwealth v. Rosario***, 248 A.3d 599, 606 (Pa. Super. 2021). "[A]n alleged error must qualify as a clear clerical error (or a patent and obvious mistake) in order to be amenable to correction." ***Id.*** (quoting ***Commonwealth v. Borrin***, 12 A.3d 466, 473 (Pa. Super. 2011) (*en banc*)).

Our review discloses that, at the close of trial, the jury convicted Appellant of first-degree murder. Jury Verdict, 11/3/23. At the sentencing hearing, the trial court observed, on the record, that the presentence investigation report (PSI) included an attached memorandum. N.T., 1/8/24, at 2. The trial court stated: "There was a PSI that was ordered, … but then there was a memorandum additionally to that PSI because of an error by the PSI writer, the third-degree murder versus first." ***Id.*** No further explanation was offered on the record. The trial court subsequently sentenced Appellant to life in prison without parole for his conviction of first-degree murder. ***Id.*** at 7.

Although Appellant clearly was convicted of first-degree murder and sentenced for that conviction, the trial court's January 8, 2024, sentencing order was titled "Ct. 1 Criminal Homicide F1 2501(a)," a patent and obvious clerical error. Sentencing Order, 1/8/24, at 1 (unpaginated). The trial court's January 31, 2024, corrected sentencing order corrected the obvious error to reflect Appellant's conviction of first-degree murder. Under these circumstances, we discern no error by the trial court in correcting the "patent and obvious" clerical error. **See Rosario**, 248 A.3d at 606. Because of the unique procedural posture of this case, we conclude that Appellant properly and timely appealed from his January 8, 2024, judgment of sentence, as corrected by the trial court's subsequent orders. For this reason, we leave the caption of the instant appeal unchanged.[3]

Appellant presents the following issues for our review:

1. Whether the evidence was sufficient to support [Appellant's] conviction of first-degree murder as a result of the Commonwealth's failure to disprove the defenses of self-defense and imperfect self-defense[?]

2. Whether the trial court erred in denying [Appellant's] motion to suppress statements when [Appellant] never provided law enforcement with a knowing, intelligent[,] and voluntary waiver of his Fifth Amendment rights[?]

Appellant's Brief at 5 (capitalization modified).

_____

[3] In doing so, we recognize that Appellant received a corrected sentence for his PPF conviction. However, as Appellant challenges only his conviction of first-degree murder, we decline to change the caption of the instant appeal to reflect a different date of sentencing for Appellant's PPF conviction.

Appellant first challenges the sufficiency of the evidence sustaining his conviction of first-degree murder. *Id.* at 12. Appellant argues the evidence "was insufficient to prove beyond a reasonable doubt that Appellant was not acting in self-defense, [where] he acted under a reasonable or unreasonable belief that deadly force was necessary." *Id.* at 16. Appellant states that the surveillance video footage showed his interaction with the victim in the parking lot. *Id.* He claims that,

> after a short interaction, the victim walked away while he continued to argue with Appellant, only to then reapproach the rear of the vehicle and [a]round the rear of the vehicle to where Appellant was standing. All the while the victim is arguing and approaching Appellant[,] he is reaching towards his waistband. Appellant's belief that the victim was carrying a weapon w[as] confirmed when[,] during the police investigation[,] they recovered brass knuckles underneath the victim's body.

*Id.* (citations omitted). According to Appellant, the victim's actions supported Appellant's belief that the victim posed a danger to Appellant. *Id.* Appellant claims his belief is supported by his prior experiences with gun violence as well as the brass knuckles found under the victim. *Id.*

A sufficiency claim "presents a question of law, for which our standard of review is *de novo* and our scope of review is plenary." ***Commonwealth v. Packer***, 168 A.3d 161, 166 (Pa. 2017).

> When reviewing a sufficiency of the evidence claim, this Court must view the evidence and all reasonable inferences to be drawn from the evidence in the light most favorable to the Commonwealth as verdict winner, and we must determine if the evidence, thus viewed, is sufficient to prove guilt beyond a reasonable doubt. This Court may not substitute its judgment for

- 7 -

that of the factfinder. If the record contains support for the verdict, it may not be disturbed.

***Commonwealth v. Burns***, 765 A.2d 1144, 1147 (Pa. Super. 2020) (citations omitted).

"[I]t is the fact-finder's province to weigh the evidence, determine the credibility of witnesses, and believe all, part, or none of the evidence submitted." ***Commonwealth v. Sanchez***, 82 A.3d 943, 972 (Pa. 2013). "[W]hen appellate review involves the trial court's findings of fact and credibility determinations, those findings are binding on the reviewing court if they find support in the record[.]" ***Commonwealth v. Norton***, 201 A.3d 112, 121 (Pa. 2019) (citation omitted).

> In applying the above test, we may not weigh the evidence and substitute our judgment for that of the fact-finder. In addition, … the facts and circumstances established by the Commonwealth need not preclude every possibility of innocence. Any doubts regarding a defendant's guilt may be resolved by the fact-finder unless the evidence is so weak and inconclusive that as a matter of law no probability of fact may be drawn from the combined circumstances. The Commonwealth may sustain its burden of proving every element of the crime beyond a reasonable doubt by means of wholly circumstantial evidence. Moreover, in applying the above test, the entire record must be evaluated and all evidence actually received must be considered. Finally, the trier of fact while passing upon the credibility of witnesses and the weight of the evidence produced, is free to believe all, part or none of the evidence.

***Commonwealth v. Dunphy***, 20 A.3d 1215, 1219 (Pa. Super. 2011) (citation omitted).

The Pennsylvania Supreme Court has identified the elements of first-degree murder as follows: "(1) a human being was unlawfully killed; (2) the

defendant was responsible for the killing; and (3) the defendant acted with malice and a specific intent to kill." ***Commonwealth v. Martin***, 101 A.3d 706, 718 (Pa. 2014) (citing 18 Pa.C.S.A. § 2502(a)). Circumstantial evidence may prove specific intent and malice where a defendant uses a deadly weapon on a vital part of the victim's body. ***Commonwealth v. Hicks***, 156 A.3d 1114, 1124 (Pa. 2017); ***see also Commonwealth v. O'Searo***, 352 A.2d 30, 37 (Pa. 1976) (stating the deadly weapon presumption is a presumption of fact "founded on human experience," since "[o]ne does not normally use a deadly weapon on a vital part of another's body unless he intends to kill." (citation omitted)).

> [T]he period of reflection required … to establish the specific intent to kill may be very brief[. I]n fact[,] the design to kill can be formulated in a fraction of a second. Premeditation and deliberation exist whenever the assailant possessed the conscious purpose to bring about death.

***Commonwealth v. Hitcho***, 123 A.3d 731, 746 (Pa. 2015).

Appellant asserted a justification defense at trial.

> "To prevail on a justification defense, there must be evidence that the defendant '(a) … reasonably believed that he was in imminent danger of death or serious bodily injury and that it was necessary to use deadly force against the victim to prevent such harm; (b) that the defendant was free from fault in provoking the difficulty which culminated in the slaying; and (c) that the [defendant] did not violate any duty to retreat.'" ***Commonwealth v. Sepulveda***, … 55 A.3d 1108, 1124 (Pa. 2012) (citing ***Commonwealth v. Samuel***, … 590 A.2d 1245, 1247-48 (Pa. 1991)). Thus, the Commonwealth satisfies its burden of disproving self-defense where it proves any one of the following: the defendant did not reasonably believe that it was necessary to kill to protect himself from imminent death or great bodily harm; the defendant was not free from fault in provoking or continuing the difficulty which

- 9 -

resulted in the slaying; or, the defendant violated a duty to retreat or avoid the danger. *Id.*; *Commonwealth v. Burns*, … 416 A.2d 506, 507 (Pa. 1980).[FN] Regarding the derivative and lesser defense of imperfect self-defense, all principles of justification must be satisfied, with the exception that there exists an unreasonable, rather than a reasonable belief that deadly force was required to save the defendant's life. *Commonwealth v. Tilley*, … 595 A.2d 575, 582 (Pa. 1991).

---

[FN] A defendant has no burden to prove a claim of self-defense. Rather, once some evidence, from whatever source, is presented to justify a finding of self-defense, the burden is upon the Commonwealth to prove beyond a reasonable doubt that the defendant was not acting in self-defense. *Sepulveda*, 55 A.3d at 1124 n.13 (citing *Commonwealth v. Black*, … 376 A.2d 627, 630 (Pa. 1977)).

*Commonwealth v. Rivera*, 108 A.3d 779, 791 (Pa. 2014) (footnote in original). Finally, the fact-finder "is not required to believe the defendant's testimony that he thought that he was in imminent danger and acted in self-defense." *Commonwealth v. Jones*, 271 A.3d 452, 458 (Pa. Super. 2021) (citations omitted).

The trial court summarized the relevant trial evidence in a light most favorable to the Commonwealth:

[T]he evidence established that on the morning of February 24, 2022, at approximately 2:00 A.M., [Appellant] was at Big Woody's Bar and Grill … when "last call" was announced and the bar closed. ([Commonwealth's Trial Exhibit (C. Ex.)] 4).[4] Earlier in the night, there had been a group of men arguing and carrying on within the establishment. This argument continued into the parking lot after Big Woody's Bar and Grill closed and the people were filing out of

---

[4] C. Ex. 4 is a photograph depicting an overview of the plaza including Big Woody's Bar and Grill.

the bar. [Appellant], also a patron at Big Woody's Bar and Grill, exited the bar. He proceeded to smoke a cigarette within the parking lot, approximately seven (7) parking spots away from where the argument was transpiring. (C. Ex. 2)[5]; (C. Ex. 3).[6] According to [Appellant], he was waiting for … Brown, who was now engaged in an argument with three (3) other men, but this evidence remained uncorroborated throughout the trial.

Even though [Appellant] was not a participant in the argument, he interjected himself by angrily gesturing towards the people arguing and walking towards that area of the parking lot. (C. Ex. 2); (C. Ex. 3). [Appellant] soon thereafter exchanged words with … Rodgers. (C. Ex. 2); (C. Ex. 3). Shortly thereafter, [] Rodgers went into a car that was parked approximately seven (7) parking spaces away from where [Appellant] was standing. (C. Ex. 2); (C. Ex. 3). **[Appellant] did not leave the area, despite there being no impediments in the northeast area of the parking lot.** (C. Ex. 2); (C. Ex. 3); (C. Ex. 4). Instead, [Appellant] removed a firearm from his clothing and held it down by his side in his right hand. (C. Ex. 2); (C. Ex. 3). [] **Rodgers then began to walk in** [**Appellant's**] **direction but walked away before he rounded a parked vehicle behind which** [**Appellant**] **was standing**. (C. Ex. 2); (C. Ex. 3). **While** [] **Rodgers was on the other side of the parked vehicle,** [**Appellant**] **reengaged** [] **Rodgers**[**,**] **who then walked around the rear of the vehicle.** (C. Ex. 2); (C. Ex. 3). As [] Rodgers was at the rear of the vehicle walking towards [Appellant], [Appellant] immediately raised his firearm and shot [] Rodgers in the chest. (C. Ex. 2); (C. Ex. 3). Mr. Rodgers buckled. (C. Ex. 2); (C. Ex. 3). [Appellant] proceeded to fire another round at [] Rodgers, striking him in his arm and torso. (C. Ex. 2); (C. Ex. 3). **As the victim turned to run,** [**Appellant**] **fired six (6) additional times at Mr. Rodgers' back until** [] **Rodgers collapsed on the pavement**. (C. Ex. 2); (C. Ex. 3). [Appellant] briskly walked away, fleeing the scene in a northeast direction through the parking lot of Big Woody's Bar and Grill. (C. Ex. 2); (C. Ex. 3). The entire shooting was captured on high-definition video from multiple views obtained from Allentown

_____

[5] C. Ex. 2 is a flash drive containing the surveillance video of the exterior of Big Woody's Bar and Grill on February 24, 2022.

[6] C. Ex. 3 is a stipulation between the parties.

- 11 -

Commons Mall.[FN] (C. Ex. 2); (C. Ex. 3). Ultimately, the shooter was identified as [Appellant].

---

[FN] Members of the Allentown Police Department viewed the video on scene and Officer Jeffrey Phillips removed the hard drive from the possession of the Allentown Commons Mall to preserve the video as evidence.

Trial Court Opinion, 4/30/24, at 4-6 (emphasis added; indented footnote in original; three footnotes identifying exhibits added; two footnotes omitted).

The trial court rejected Appellant's sufficiency challenge to his first-degree murder conviction:

Viewing all the evidence and all reasonable inferences arising therefrom in the light most favorable to the Commonwealth, it is clear that the evidence was sufficient to enable a finder of fact to conclude that all the elements of the offenses were established beyond a reasonable doubt. Indeed, at the conclusion of the jury trial, the jury had no doubt that [Appellant] intentionally killed … Rodgers, as the evidence demonstrated that the killing was willful, deliberate, and premeditated. Moreover, the killing was not in self-defense or imperfect self-defense, as there was sufficient evidence to demonstrate that [Appellant] was the aggressor and failed to comply with his duty to retreat….

*Id.* at 13. Upon careful review, we agree.

The evidence established Rodgers initially walked away from the altercation. Rather than retreating, Appellant reengaged with Rodgers, pulling out a firearm and shooting Rodgers. Appellant continued shooting Rodgers in the back as **Rodgers attempted to flee.** Thus, the Commonwealth's evidence established beyond a reasonable doubt that Appellant was not free from fault in "provoking or continuing the difficulty which resulted in the slaying"; and Appellant "violated his duty to retreat or avoid the danger."

*Rivera*, 108 A.3d at 791. Appellant's challenge to the jury's rejection of his justification defenses lacks merit, and his challenge to the sufficiency of the evidence underlying his murder conviction fails.

Appellant next argues that the trial court improperly denied his pretrial motion to suppress evidence of his confession to police. Appellant's Brief at 17. Appellant argues he did not make a knowing, intelligent and voluntary waiver of the protections afforded by the Fifth Amendment to the United States Constitution. *Id.* at 16, 19. According to Appellant, on February 24, 2022, he "repeatedly told the police that he did not want to answer their questions nor waive his rights, yet the police persisted in questioning him." *Id.* at 19. Appellant further argues,

> even if this Court finds that Appellant was properly [*Mirandized*,[7]] the interrogation was still so manipulative and coercive that it deprived him of his ability to make a free and unconstrained decision to speak with police.

*Id.* (footnote added).

Appellant explains that when presented with the *Miranda* waiver form, he immediately stated he did not wish to waive his rights. *Id.* Appellant argues that within the next ten minutes, he confirmed his decision not to waive his Fifth Amendment protections at least eight times. *Id.* at 19-20. Appellant claims he signed the *Miranda* waiver form only after being "constantly harassed and harangued by the detectives." *Id.* at 20. Appellant claims his

---

[7] *Miranda v. Arizona*, 382 U.S. 925 (1965).

waiver was not voluntary, where he had "repeatedly expressed an unequivocal assertion that he did not want to speak with [police] and wanted to remain silent." *Id.*

Appellant further argues,

[t]he detectives also told Appellant he would retain his rights, despite that clearly not being the case. The detectives … misinformed Appellant of his rights by explaining that, "unless you have a lawyer on retainer that we can call down here, you're okay with talking to us at the moment without an attorney." Simply stated, the detective would not take no for an answer.

*Id.* at 20-21.

Our review of "a challenge to the denial of a suppression motion is limited to determining whether the suppression court's factual findings are supported by the record and whether the legal conclusions drawn from those facts are correct." *Commonwealth v. Jones*, 988 A.2d 649, 654 (Pa. 2010). We may only review "the evidence presented at the suppression hearing when examining a ruling on a pre-trial motion to suppress." *Commonwealth v. Harlan*, 208 A.3d 497, 499 (Pa. Super. 2019) (citation omitted).

It is within the suppression court's sole province as factfinder to pass on the credibility of witnesses and the weight to be given to their testimony. The suppression court is free to believe all, some or none of the evidence presented at the suppression hearing. …

*Commonwealth v. Byrd*, 185 A.3d 1015, 1019 (Pa. Super. 2018) (citation omitted). This Court is bound by the suppression court's factual findings that are supported by the record, but we are not bound by its legal conclusions,

- 14 -

which we review *de novo*. ***Commonwealth v. Briggs***, 12 A.3d 291, 320-21 (Pa. 2011).

The Fifth Amendment commands, in relevant part, that "No person … shall be compelled in any criminal case to be a witness against himself …." U.S. CONST. amend V. To effectuate that constitutional provision, the Supreme Court of the United States has explained that, once in police custody, "the accused must be adequately and effectively apprised of his rights and the exercise of those rights must be fully honored." ***Miranda***, 384 U.S. at 467. Thus, an arrested individual

> must be warned prior to any questioning that he has the right to remain silent, that anything he says can be used against him in a court of law, that he has the right to the presence of an attorney, and that if he cannot afford an attorney one will be appointed for him prior to any questioning if he so desires….

***Id.*** at 479. "Opportunity to exercise these rights must be afforded to him throughout the interrogation." ***Id.*** "After such warnings have been given, and such opportunity afforded him, the individual may knowingly and intelligently waive these rights and agree to answer questions or make a statement." ***Id.***

When officers give the ***Miranda*** warnings prior to questioning suspects, whether inculpatory statements made thereafter are admissible at trial is an inquiry that:

> has two distinct dimensions. First, the relinquishment of the right must have been voluntary in the sense that it was the product of a free and deliberate choice rather than intimidation, coercion, or deception. Second, the waiver must have been made with a full

awareness both of the nature of the right being abandoned and the consequences of the decision to abandon it. Only if the totality of the circumstances surrounding the interrogation reveal both an uncoerced choice and the requisite level of comprehension may a court properly conclude that *Miranda* rights have been waived.

*Int. of N.M.*, 222 A.3d 759, 772 (Pa. Super. 2019) (citations omitted). Thus, if the apprehended suspect knowingly and intelligently waived his Fifth Amendment right to remain silent, the prosecution may use the confession in its case-in-chief. *Id.*

The suppression court issued the following findings of fact, related to Appellant's waiver of his *Miranda* rights:

1. On February 24, 2022, Detective Raymond Ferraro [(Detective Ferraro)] of the Allentown Police Department responded to Big Woody's Bar and Grill … for the reporting of a shooting. Upon arrival, members of the Allentown Police Department located … [Rodgers] deceased from what appeared to be multiple gunshot wounds. Officers also observed several 9 mm spent shell casings in the parking lot in front of Big Woody's Bar and Grill.

2. As a result of the investigation into the death of [] Rodger[s], [Appellant] was taken into custody on an outstanding Lehigh County Adult Probation and Parole warrant. [Appellant] was transported to the Headquarters of the Allentown Police Department and was subsequently interviewed by Detective Ferraro and Detective Amaury Almonte [(Detective Almonte),] in an interview room located in the Criminal Investigations Division of the Allentown Police Department[,] with regard to the homicide that occurred that day …. ([Sentencing Exhibit (Ex.)] 1).[8] At the commencement of the interview, [Appellant] was offered both food and beverage, and he was provided with a soda, as well as a blanket. ([] Ex. 1).

_____

[8] Ex. 1 is a flash drive containing the video recording of Appellant's police interview on February 24, 2022.

3. After biographic information was acquired from [Appellant], Detective Ferraro explained to [Appellant] that [police] could not speak with him unless he agreed to talk with them and waived his *Miranda* rights. ([] Ex. 1). Prior to even being read the Allentown Police Department Rights Warning and Waiver Form [(waiver form)], [Appellant] indicated that he did not want to waive his rights because "how I am supposed to have rights after I waive my rights?" ([] Ex. 1). In response, Detective Almonte attempted to explain to [Appellant] that the waiver of his rights was limited to that interview and it did not extend beyond that interview to future proceedings. ([] Ex. 1). He further elaborated and told [Appellant] that "it is completely up to [him]" and that he "can answer what [he wants]" and not answer what he wants, and that the [waiver form] explained that concept. ([] Ex. 1); ([] Ex. 2).[9]

4. Still confused about the future effect of waiving his *Miranda* rights during that interview, [Appellant] inquired, "If I waive rights, what rights do I have?" ([] Ex. 1). Detective Ferraro assured [Appellant] that the waiver of his *Miranda* rights would not extend beyond that interview. ([] Ex. 1).

5. Detective Ferraro again reiterated that he wanted [Appellant] to understand his rights and that he was going to read them to [Appellant] from the [waiver form]. ([] Ex. 1); ([] Ex. 2). Prior to the *Miranda* rights being read to [Appellant], [Appellant] indicated, "I don't know, there's something wrong with that, if I waive my rights."

6. As the *Miranda* warnings had yet to be read to [Appellant], Detective Ferraro believed that reading the [waiver form] would help to clear up any confusion that [Appellant] had with regard to his legal rights. ([] Ex. 2). Detective Ferraro explicitly stated to [Appellant] that he wanted [Appellant] to understand his rights. ([] Ex. 1).

7. Therefore, Detective Ferraro read the [waiver form] to [Appellant]. ([] Ex. 1); ([] Ex. 2). At one point, [Appellant] interrupted Detective Ferraro because he had a question. ([] Ex. 1). Consequently, Detective Ferraro started over in

---

[9] Ex. 2 is Appellant's signed *Miranda* warning/waiver.

reading the [waiver form], and this time he read it line by line. ([] Ex. 1); ([] Ex. 2). Between each distinct right mentioned, Detective Ferraro asked [Appellant] if he understood that specific right. [Appellant] acknowledged that he understood each right as they were individually read to him until Detective Ferraro read the provision about being able to stop the interview at any time. ([] Ex. 1); ([] Ex. 2). [Appellant] requested that Detective Ferraro read that provision another time. ([] Ex. 1); (C, Ex. 2), Detective Ferraro complied with [Appellant's] request and further explained that [Appellant] could "stop at any time [he] want(s)." ([] Ex. 1). [Appellant] indicated that he understood this right ([] Ex. 1).

8. At the conclusion of reading the [waiver form], Detective Ferraro inquired, "Do you understand these rights?" (C. Ex. 1); ([] Ex. 2). [Appellant] indicated that he did. ([] Ex. 1). Then, Detective Ferraro asked [Appellant], "With these rights in mind, do you wish to talk with us?" ([] Ex. 1). To this inquiry, [Appellant] replied, "I can stop when I want, but I'm still waiving my rights." ([] Ex. 1). Again, Detective Ferraro reiterated that [Appellant] would "get [his] rights back the minute [he] say[s he's] done talking." ([] Ex. 1).

9. Being still seemingly confused over the legal effect on future proceedings of waiving his rights and executing the [waiver form]. [Appellant] stated, "I'm not sure[.] [Y]ou keep pressing me." ([] Ex. 1). He further indicated, "I'm not sure if I want to sign it." ([] Ex. 1). Detective Ferraro then indicated that he was not going to force [Appellant] to sign the form but that [Appellant] needed to understand it. ([] Ex. 1). [Appellant] acknowledged that he understood his rights for the most part, but still appeared to be concerned over the future impact of agreeing to waive his rights. ([] Ex. 1). In fact, [Appellant] urged Detective Ferraro to write on the paper that he would get his rights back, because "you can't just tell me that." ([] Ex. 1). Detective Ferraro attempted to allay [Appellant's] concerns by explaining that his rights were preserved through the law. ([] Ex. 1). [Appellant] replied, "yes, you telling me that, but why it's not saying that." ([] Ex. 1). He further inquired, "when do I get my rights back?" ([] Ex. 1). Detective Ferraro again explained that [Appellant's] rights would be restored as soon as he no longer wished to talk any more. ([] Ex. 1).

10. Detective Ferraro once again inquired of [Appellant] if he wished to talk with them or if there was anything more that he would like them to explain to him. (C. Ex. 1). In an abundance of caution to confirm that [Appellant] understood his rights, Detective Ferraro again read the [waiver form] line by line. ([] Ex. 1); ([] Ex. 2). After each provision, Detective Ferraro inquired if [Appellant] understood the right contained therein. ([] Ex. 1). [Appellant] indicated that he understood each provision of the [waiver] form, until Detective Ferraro read the provision regarding the ability to stop answering questions at any time. ([] Ex. 1); ([] Ex. 2). [Appellant] requested to read that one because "I don't want you just telling me, you know what I mean?" ([] Ex. 1).

11. After [Appellant] was given the opportunity to read [the form] himself, Detective Ferraro once again inquired if [Appellant] understood or if he had any questions. (C. Ex. 1). [Appellant] indicated that he understood it but "I am questioning myself." ([] Ex. 1). Detective Ferraro asked if with these rights in mind, if [Appellant] wished to speak with them, to which [Appellant] replied in the affirmative. ([] Ex. 1). However, when Detective Ferraro asked if [Appellant] wanted to sign the [waiver form], [Appellant] replied, "I'm still not sure." ([] Ex. 1); (C. Ex 2). To clarify, Detective Ferraro asked if [Appellant] was referring to not being sure about talking with [police], and [Appellant] indicated, "No, not about talking, about signing it, because that's my rights." ([] Ex. 1). Consequently, Detective Ferraro explained to [Appellant] that he did not need to execute the [waiver form]. ([] Ex. 1); ([] Ex. 2).

12. [Appellant] explained that he did not want to sign the [waiver form] because "I don't want to waive my rights. I don't feel comfortable waiving my rights." ([] Ex. 1). Again, Detective Ferraro assured [Appellant] that he could stop talking at any time, and he asked if [Appellant] understood this concept. ([] Ex. 1). [Appellant] indicated that he did understand. ([] Ex. 1). Detective Ferraro reiterated that if [Appellant] would decide to answer questions, he could stop at any time; [Detective Ferraro] then asked if [Appellant] was comfortable talking with [police]. ([] Ex. 1). To this, [Appellant] stated, "I can stop at any time, have my rights back. How do I 100% have it if I have to waive my rights?" ([] Ex. 1). Again, Detective Ferraro explained to [Appellant] that the [waiver form] was a standard document based on the landmark United

States Supreme Court decision in [***Miranda***], and that he has the right not to answer any questions. ([] Ex. 1).

13. At this time, [Appellant] reached for the [waiver form] and signed it. ([] Ex. 1); ([] Ex. 2).

14. In addition, neither Detective Ferraro nor Detective Almonte tried to intimidate, threaten, or coerce [Appellant]. ([] Ex. 1). Indeed, [Appellant] was not handcuffed or tethered in any fashion. ([] Ex. 1). Both Detective Ferraro and Detective Almonte presented themselves calmly and never issued threats to [Appellant]. ([] Ex. 1). The detectives were dressed in plain clothes and did not display a firearm. ([] Ex. 1).

15. Once the interview began, [Appellant] did not request to speak with an attorney. Also, [Appellant] never indicated that he desired to terminate the interview at any time prior to the end of the interview.

Trial Court Opinion (Suppression), 11/14/22, at 2-7 (footnotes added). The suppression court further found that

[b]oth Detective Ferraro and Detective Almonte presented themselves calmly, spoke in a conversational tone, and never issued threats to [Appellant]. The detectives were dressed in plain clothes and did not display a firearm.

***Id.*** at 14.

The suppression court ultimately determined that Appellant knowingly and intelligently waived his Fifth Amendment rights:

[B]ased on the totality of the circumstances, [the suppression court] finds that [Appellant] indicated a clear willingness to speak with the detectives without an attorney present. Indeed, [Appellant] did not equivocate in his decision to speak with the detectives, but rather continuously communicated his confusion over the future legal effect of waiving his ***Miranda*** rights at that time. [Appellant] was concerned that by waiving his rights and executing the [waiver form], there would be a future legal impact from this action in which he would permanently lose these ***Miranda*** rights and not be able to reclaim them. …

- 20 -

....

> [The suppression court finds] that during the interview, [Appellant] was oriented, appropriate, coherent, and logical. Detective Ferraro and Detective Almonte appropriately and adequately provided [Appellant] with his **Miranda** warnings. Moreover, at the conclusion of his recital of the **Miranda** rights, Detective Ferraro properly inquired if [Appellant] understood these rights and if he wanted to speak with them with those rights in mind, to which [Appellant] indicated that he did. [The suppression court] concludes, based on the totality of the circumstances, [Appellant] knowingly, voluntarily, and intelligently waived his **Miranda** rights. Based on the evidence introduced at the evidentiary hearing and the totality of the circumstances, the [c]ourt finds that [Appellant] knowingly, voluntarily, and intelligently waived his **Miranda** rights.

**Id.** at 9, 14.

The evidence supports the suppression court's determination that Appellant's **Miranda** waiver "was the product of a free and deliberate choice rather than intimidation, coercion, or deception." **Int. of N.M.**, 222 A.3d at 772. The totality of the circumstances demonstrate Appellant was apprised and aware of "both of the nature of the right being abandoned and the consequences of [his] decision to abandon it." **Id.** Finally, we observe that the suppression court was able to view video of Appellant's waiver of his **Miranda** rights. Because the suppression court's findings are supported in the record and we discern no legal error, Appellant's suppression challenge merits no relief. **See Jones**, 988 A.2d at 654. Accordingly, we affirm Appellant's judgment of sentence.

Judgment of sentence affirmed.

Judgment Entered.

Benjamin D. Kohler, Esq.
Prothonotary

Date: 12/5/2024